FILED
07/05/2017
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 23, 2017 Session

## IN RE BRAXTON M. ET AL.

### Appeal from the Circuit Court for Greene County
#### No. 15A004     Beth Boniface, Judge

_____

### No. E2016-02172-COA-R3-PT

_____

This is a termination of parental rights case, focusing on Braxton M. and Briley N., the minor children ("the Children") of Kevin M. ("Father") and Heather N. ("Mother"). On March 21, 2011, the Washington County Juvenile Court ("juvenile court") entered an order removing the Children from the parents' custody and placing them in the physical custody of Mother's father and stepmother, William N. and Donna N. ("Maternal Grandparents") in response to a dependency and neglect action initiated by the Tennessee Department of Children's Services ("DCS") due to Briley's drug-exposed condition at birth.[1] In September 2011, the juvenile court entered an order maintaining physical custody of the Children with Maternal Grandparents and directing that the parents would retain the option of petitioning for return of custody at a later date. On April 15, 2015, Maternal Grandparents filed a petition in the Greene County Circuit Court ("trial court") to terminate the parental rights of the parents and adopt the Children. Mother subsequently surrendered her parental rights to the Children and is not a party to this appeal. Following a bench trial, the trial court found that statutory grounds existed to terminate the parental rights of Father upon its finding by clear and convincing evidence that Father had abandoned the Children by willfully failing to financially support and visit them. *See* Tenn. Code Ann. § 36-1-113(g)(1). Finding Father to be a putative father, the trial court also applied the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv)-(v) to find clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of the Children and that placing the Children in Father's legal and physical custody would pose a risk of substantial harm to their physical or psychological welfare. The court further found by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest. Father has appealed. Having determined that the trial court erred in applying an amended version of Tennessee Code Annotated § 36-1-113(g)(9)(A) not controlling in this action, we further determine the statutory grounds provided in subsection -113(g)(9)(A)(iv)-(v) to be inapplicable to Father under the

_____

[1] DCS is not a party to the instant action or appeal.

controlling version of the statute. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Jessica C. McAfee, Greeneville, Tennessee, for the appellant, Kevin M.

Brent Hensley, Greeneville, Tennessee, for the appellees, Donna N. and William N.

**OPINION**

I. Factual and Procedural Background

When Braxton was born in September 2007, Father was seventeen years old and Mother was sixteen years of age. At the time of the July and August 2016 trial in this action, Father was in the custody of the Greene County Jail but was transported to appear before the trial court. Father testified that although Mother and he were never married, they lived together with Braxton for several years, at first residing with Mother's biological mother, then with Maternal Grandparents, and ultimately on their own. Father explained that he graduated from high school when he was eighteen and that he and Mother found "a place" at that time, keeping Braxton with them.

According to Father, when Braxton was two years old, Father and Mother developed addictions to pain medication. At the age of nineteen, Father pled guilty to criminal charges of aggravated burglary and theft over $1,000, resulting in a sentence of three years' probation. Father subsequently was arrested again and entered a guilty plea to eight counts of theft over $1,000 and violation of probation, resulting in a sentence of five years' and two days' incarceration. When Father entered custody in the fall of 2010, Mother was expecting Briley, who was born in early March 2011. Mother also testified at trial, essentially corroborating Father's testimony concerning the years preceding Briley's birth.

Upon a referral at the time of Briley's birth, the family became the subject of a DCS investigation because Briley was born exposed to drugs. DCS initiated a dependency and neglect action in the juvenile court, requesting emergency removal of the Children from the parents' custody and placement with Maternal Grandparents. In an order entered March 21, 2011, the juvenile court granted physical custody of the Children

2

to Maternal Grandparents. Father testified that although he was incarcerated at the time of the Children's removal, he was transported to appear in the juvenile court for a March 2011 hearing during which he, while represented by court-appointed counsel, agreed that temporary placement of the Children with Maternal Grandparents would be in the Children's best interest.

The juvenile court subsequently entered an order on September 6, 2011, maintaining physical custody of the Children with Maternal Grandparents and directing that the parents would retain the ability to petition for custody at a later date. We note that no juvenile court orders are in the record before us. However, the effects of the juvenile court's actions were described by the trial court in its final decree and are not in dispute on appeal. The record contains no indication of whether the Children were adjudicated dependent and neglected by the juvenile court.

According to Father, he served twenty-seven months and seventeen days of his approximately five-year sentence before being released on November 20, 2012. Although Father returned to custody in 2013 to serve thirty days for a trespassing conviction, Maternal Grandparents do not dispute that Father visited the Children fairly regularly from November 20, 2012, through the end of 2013. Father visited the Children primarily at Maternal Grandparents' home but also sometimes at the home of the Children's paternal grandparents ("Paternal Grandparents"). Father testified that he would often bring his then-paramour, L.H., and her daughter, S.R., who was approximately the same age as Briley, to visit with Briley and allow the girls to play together. Undisputed testimony demonstrated that Father, the Children, L.H., and S.R. accompanied Paternal Grandparents and other family members during a five-day vacation to an out-of-state amusement park in 2013. Father, L.H., and S.R. also visited with the Children over the course of approximately one and one-half days during the 2013 Christmas holiday.

Father testified that he was not incarcerated from January to June 2014. A 2014 calendar maintained and presented by Donna N. ("Maternal Grandmother") reflected that in 2014, Father visited the Children once in March for Briley's birthday, twice in April, and once in May. A note written on the calendar for the month of April stated that Maternal Grandparents had "set up visitation for [Father] to visit every other Sun. for 2 hrs. from 2-4." Father's next three visits took place on alternate Sundays in 2014: April 13, April 27, and May 11. Father acknowledged that near the end of the May 11, 2014 visit, he promised Braxton that he would purchase juice boxes and bring them back later in the day so that Braxton could take the juice boxes to school. Father admitted forgetting about the juice boxes until the next day. He stated that the days slipped away thereafter until he felt he had missed the opportunity to bring the juice to Braxton. L.H.,

who had been present during the May 11, 2014 visit, testified that Father and she did not return with juice boxes for the Children that day because Father and she "were on drugs."

In late June 2014, Father was arrested and served twenty days in jail for conviction of what he described as evading arrest or filing a false report. He was subsequently involved in an altercation in August or September 2014, which gave rise to his entering a guilty plea to a charge of simple assault on December 8, 2014. As a result, Father was incarcerated from December 31, 2014, through February 2015, and was then sent to court-ordered rehabilitation in Kingsport, Tennessee.[2] Father testified that he completed rehabilitation in March 2015. However, Father was again incarcerated in October 2015 for violation of probation and was subsequently charged with introduction of contraband, specifically Suboxone strips, into a penal facility. Father testified that he had been indicted on the charge of introduction of contraband and had a trial date set for September 2016. We note that because no documentation of Father's criminal history was presented during trial in this action, the trial court relied on Father's description of his criminal history, which Maternal Grandparents have not disputed.

Father acknowledged that he had not visited the Children since May 11, 2014. He presented print-out copies of several messages he had sent to Maternal Grandmother via Facebook. Although all of the messages included the month and day they were posted, several were missing the year. Of those messages that did include the year, some were posted in 2013 and reflect communication regarding Father's visits with the Children during that time, as well as Father's promise in July 2013 to deliver a money order to Maternal Grandparents. An exchange of messages in March 2014 reflects arrangements for Father to deliver an item for Briley near her birthday.

On November 23 and 24, 2014, and on December 14, 2014, Father sent Facebook messages to Maternal Grandmother in which he sought to visit the Children, although he also expressed frustration in the November 23, 2014 message, stating: "Every time I turned around its there [sic] not mine or u will never get them and I let it get to me and gave up." In the December 14, 2014 message, Father requested that he be allowed to "please talk to the kids or see them," continuing by stating that he "just want[ed] a start with the kids somewhere please."[3] Maternal Grandmother testified that "some time" elapsed between Father's last visit with the Children and when he began to send her messages via Facebook near the end of 2014. She acknowledged that she had not

---

[2] Father testified that he had been incarcerated on December 29, 2014, but subsequently testified that he "did not go to jail until December 31st." The parties stipulated that the relevant incarceration period began on December 31, 2014.

[3] Although during trial Father identified the date of this message as December 14, 2015, the printout of the Facebook page reflects that the message was posted on December 14, 2014.

responded to Father's more recent Facebook messages, stating that she "thought it was time to quit having him coming in and out of [the Children's] lives." Father acknowledged that after May 2014, the Facebook messages he posted were his only attempts to contact Maternal Grandparents regarding visitation with the Children.

Father testified that when not incarcerated, he had been employed in several capacities. He maintained that he was in good health and suffered no physical limitations. Father stated that upon his release from custody in November 2012, he obtained employment with Krystal Restaurant ("Krystal") and worked there through the early summer of 2013. However, the exact dates of Father's employment with Krystal were not clear from his testimony. Krystal payroll records presented by Father reflect paychecks dated May 27, 2013, through August 5, 2013. According to Father, he obtained a part-time job at Quik Stop, a convenience store, in June 2013 while he was still working at Krystal and then stopped working at Quik Stop in April or May of 2014.

During the summer of 2014, Father performed some temporary work through LQM, a staffing company. Father acknowledged that he did not maintain regular employment again until November 2014 when he obtained a position with Affordable Tree Service, earning ten dollars per hour. He stated, however, that prior to working for Affordable Tree Service, he did "a lot of odd stuff," including roofing for various people. Father opined that once released from his current incarceration, he would probably be able to return to employment with Affordable Tree Service.

Father does not dispute that his sole monetary payment to Maternal Grandparents in support of the Children consisted of a money order in the amount of $100.00, which he mailed to Maternal Grandparents at some point in 2012 or 2013. He acknowledged that he sent the money order partially for "legal purposes" because he hoped to eventually petition to regain custody of the Children. He also had a total of $398.15 taken out of his Krystal paychecks to cover health insurance for the Children. Father acknowledged that he did not voluntarily request that the Children be covered by his health insurance, stating that their coverage was required due to a pending child support enforcement action. Father also acknowledged that although he was covered by health insurance through his employment with Quik Stop, the Children were not. It is undisputed that Father had not been under any court order to pay child support. Maternal Grandmother testified that although she had been to child support court several times, a hearing had been set as to Father only once and was then continued due to Father's incarceration.[4]

It is also undisputed that in 2013 and 2014, Father provided some birthday and holiday gifts for the Children and purchased some items of clothing for the Children.

---

[4] The record in this matter contains no documentation of a child support action against Father.

Paternal Grandmother corroborated Father's testimony that she dropped off the items of clothing, which also included donated items from another family member, on Maternal Grandparents' front porch. Paternal Grandmother identified a photograph taken of a bag of clothing items on Maternal Grandparents' front porch, stating that the date was in 2013 or 2014. Father described presents he provided for the Children in 2013 and 2014. He also testified that he attempted to provide bags of disposable diapers for Briley but that Maternal Grandparents directed him to take back the diapers, once because he had bought a brand that purportedly gave Briley a rash and once because Maternal Grandparents said they had enough diapers. Maternal Grandmother's 2014 calendar reflected that Paternal Grandmother dropped off Christmas presents for the Children on December 23 of that year. Father testified that he had provided Christmas presents in 2014 for Paternal Grandmother to take to the Children.

On April 15, 2015, Maternal Grandparents filed a petition to terminate the parental rights of the parents. As to Father, they alleged statutory grounds of (1) abandonment through willful failure to financially support the Children, (2) abandonment through willful failure to visit the Children, (3) Father's failure to manifest an ability and willingness to assume legal and physical custody of the Children, and (4) a significant risk of substantial harm to the physical or psychological welfare of the Children if they were placed in Father's legal and physical custody. Maternal Grandparents concomitantly filed a petition for adoption of the Children, requesting, *inter alia*, that Braxton's surname be changed from Father's surname to their own, which had been Briley's surname since birth. Father was not served with the termination petition until October 2, 2015, during the approximate period of time when he was arrested on outstanding warrants for violation of probation. On January 8, 2016, the trial court entered an order finding Father to be indigent and appointing counsel to represent him during the termination proceedings. The transcript and final judgment demonstrate that at some point prior to trial, the court appointed attorney Alex A. Chesnut as a guardian *ad litem* to represent the Children.[5] Father filed an answer to the termination petition on February 11, 2016, denying all substantive allegations and requesting dismissal of the petition.

Following two days of trial conducted on July 22, 2016, and August 24, 2016, the trial court took the matter under advisement. On September 2, 2016, the court entered a memorandum opinion granting the termination petition as to Father upon finding by clear and convincing evidence that Father had abandoned the Children through willfully failing to financially support and visit them. *See* Tenn. Code Ann. § 36-1-113(g)(1). The court also found that because Father had not executed an unrevoked and sworn acknowledgment of paternity as to either child, he was a putative father to the Children,

---

[5] The order appointing the guardian *ad litem* is not in the record on appeal.

6

rather than a legal father. Applying the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv)-(v), the court found clear and convincing evidence that Father had failed to manifest an ability and willingness to assume legal and physical custody of the Children and that placement of the Children in Father's legal and physical custody would pose a significant risk of substantial harm to the physical or psychological welfare of the Children. The court further found by clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

Father filed a premature notice of appeal on September 19, 2016. On October 21, 2016, the trial court entered a final order with incorporated memorandum opinion, terminating Father's parental rights to the Children and granting Maternal Grandparents' petition to adopt the Children, including the request to change Braxton's surname. Father subsequently filed an amended notice of appeal, which this Court treated as timely pursuant to Tennessee Rule of Appellate Procedure 4(d).

## II. Issues Presented

On appeal, Father presents four issues, which we have restated as follows:

1.  Whether the trial court erred by finding clear and convincing evidence of the statutory ground of abandonment by willful failure to financially support the Children.

2.  Whether the trial court erred by finding clear and convincing evidence of the statutory ground of abandonment by willful failure to visit the Children.

3.  Whether the trial court erred by finding that Father was a putative father to the Children, rather than a legal father, and terminating Father's parental rights based on the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv)-(v).

4.  Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Children's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530

(Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *See In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III,* 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky,* 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as

8

highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Statutory Abandonment

Tennessee Code Annotated § 36-1-113 (2014 & Supp. 2016) lists the statutory grounds for termination of parental rights, providing in pertinent part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined, *inter alia*, that Father had abandoned the Children by willfully failing to financially support and visit them in the four months immediately preceding Father's incarceration prior to the filing of the termination petition. Tennessee Code Annotated § 36-1-113(g)(1) (Supp. 2016) provides, as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2016) defines abandonment, in relevant part, as:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child; . . .

* * *

(iv)     A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration . . . .

The parties stipulated during trial that because Father was incarcerated during the four consecutive months immediately preceding the filing of the petition on April 15, 2015, the statutory determinative period for abandonment through failure to visit and

10

support was four months immediately preceding Father's incarceration on December 31, 2014. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). The trial court therefore accepted the parties' stipulated determinative period as spanning August 31, 2014, through December 31, 2014. This Court previously has determined that, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(iv), the four-month period "immediately preceding" the parent's incarceration ends on the day before the actual date of incarceration. *See, e.g., In Re Jayden B.T.*, No. E2014-00715-COA-R3-PT, 2015 WL 3876573, at *4 (Tenn. Ct. App. June 23, 2015), *perm. app. denied* (Tenn. Sept. 25, 2015); *In re D.H.B.*, No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *8 (Tenn. Ct. App. Apr. 23, 2015). We therefore conclude that the statutory determinative period prior to Father's incarceration in this case spanned August 31, 2014, through December 30, 2014 ("determinative period"). We note, however, that this one-day difference in the end of the determinative period does not affect the outcome of this action or the issues raised on appeal.

### A. Willful Failure to Support

Father contends that the trial court erred by finding that he willfully failed to financially support the Children during the determinative period. In its memorandum opinion incorporated into the final judgment, the trial court specified the following, in pertinent part, regarding the statutory ground of willful failure to support the Children:

> Father has worked many different jobs. He worked at Krystal's, Affordable Tree Service, LQM staffing, a roofing company, a cheese factory[6] and Quik Stop. Father has an affable personality with an accompanying intellect. The Court credits Mother's testimony that Father never kept a job for a long time but that he had no trouble securing new employment. Father admitted that he had the ability to work and support his children. Prior to receiving custody of the minor children in 2011, maternal grandparents allowed Father and Mother to move into their home to help support them. While the parents were living there, Father broke into the Maternal Grandparents' locked bedroom and stole his son's Gameboy and the Maternal Grandparents' jewelry.[7] Father admits that his only financial support over the five years that custody of his minor children

---

[6] Paternal Grandmother testified that Father had been employed during an unspecified time period at The Cheese Factory in Greeneville, Tennessee.

[7] During trial, Mother described Father's theft of a Game Boy video game device and jewelry from Maternal Grandparents' locked bedroom. The incident occurred during the time period prior to removal of the Children from the parents' custody when the parents and Braxton were residing with Maternal Grandparents.

has been removed from him is a $100 money order, six or seven weeks of health insurance in 2013, some toys and a bag of clothes.

* * *

Although counsel for Father argued that there was no court order requiring Father to pay support, Father acknowledged his awareness to provide financially for his minor children. Father testified that he was not incarcerated except for approximately 10 to 20 days in 2014. Father had a long history of employment, had no disabilities and continued to fund his drug habit while [Maternal Grandparents] provided for his children. Father's paramour stated that starting in March 2014, Father was using Roxicodone a couple times a day at the cost of $35 per pill. Father's last employer paid him $10 an hour. Father admitted that he willfully made no payments from August 31, 2014 until December 31, 2014. Father was forced to list the minor children on his insurance through his employment at Krystal's and they were covered by his insurance between June 24, 2013 and August 5, 2013. Father admitted that his only financial payment to [Maternal Grandparents] was $100 at some point during the five years that [Maternal Grandparents] have had the children. The Court credits [Maternal Grandparents'] testimony that the $100 was not during the essential time period. Father also testified to bringing toys and some clothes to [Maternal Grandparents'] house but not during the four months preceding his incarceration. Even if the payment and items had been given during the four month period, the Court finds them to be token support. *See In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. August 25, 2005). The Court finds by clear and convincing evidence that Father willfully failed to support his children from August 31, 2014 until December 31, 2014. Further the Court finds that since March 21, 2011, Father has willfully not supported his children.

The trial court therefore found that Father had willfully failed to provide more than token support of the Children during the years they were in Maternal Grandparents' custody, inclusive of the determinative four-month period prior to Father's December 31, 2014 incarceration. *See* Tenn. Code Ann. § 36-1-102 (1)(B) (Supp. 2016) (defining "token support" to mean that "the support, under the circumstances of the individual case, is insignificant given the parent's means"). Upon our thorough review of the record, we agree with the trial court on this issue.

Father does not dispute the trial court's finding that he made no monetary contributions to the Children's support during the determinative period. He also does not

dispute the court's finding that during the approximately five years the Children were in Maternal Grandparents' custody, Father's total monetary contributions to the Children's support consisted of one $100 money order mailed to Maternal Grandparents in 2012 or 2013 and $398.15 deducted from Father's paychecks for health insurance to cover the Children for six weeks during the summer of 2013, both occurring prior to the beginning of the determinative period. According to Father's testimony, the only items Father provided for the Children during the determinative period were Christmas gifts delivered by Paternal Grandmother in December 2014 and possibly some items of clothing. Father raises no issue regarding the trial court's finding that these items constituted no more than token support. *See, e.g., In re Hailey S.*, No. M2015-00842-COA-R3-PT, 2016 WL 3209444, at *11 (Tenn. Ct. App. May 31, 2016), *perm. app. denied* (Tenn. Mar. 1, 2017) (determining that small gifts provided to the child by the father constituted merely token support when the father was "admittedly capable of working and actually employed at various times").

Father acknowledges that he was able-bodied and employed to some extent during the determinative period. He contends, however, that the trial court erred by finding that he had the ability to pay child support and that his failure to do so was therefore willful. *See In re R.L.F.*, 278 S.W.3d 305, 320 (Tenn. Ct. App. 2008) (overruled on other grounds by *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)) ("'A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child.'") (quoting *In re M.J.M., Jr.*, No. M2004-02377-COA-R3-PT, 2005 WL 873302, at *8 n.17 (Tenn. Ct. App. Apr. 14, 2005)). Father argues that because Maternal Grandparents did not present detailed evidence regarding his living expenses during the determinative period, they failed to prove that he had the ability to pay child support. We disagree.

As this Court previously has explained:

[T]he element of willfulness is essential and central to the determination of abandonment. *In re M.L.D.,* 182 S.W.3d 890, 896 (Tenn. Ct. App. 2005); *In re C.M.C.,* No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *6 (Tenn. Ct. App. Aug. 3, 2005). Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. *In re Audrey S.,* 182 S.W.3d at 863; *see also In re S.M.,* 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004). Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts. *In re Audrey S.,* 182 S.W.3d at 863. "A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his

13

control." *In re Adoption of Angela E.,* 402 S.W.3d [636,] 640 [(Tenn. 2013)] (citing *In re Adoption of A.M.H.,* 215 S.W.3d at 810 (holding that the evidence did not support a finding that the parents "intentionally abandoned" their child)).

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014), *perm. app. denied* (Tenn. Mar. 16, 2015).

Although Father testified that his employment with Quik Stop ended in April or May 2014 and his temporary work with LQM ended in August 2014, he stated that he continued to work at "a lot of odd stuff," including roofing jobs.[8]  According to Father, the altercation that led to his simple assault conviction occurred in August or September of 2014, near the beginning of the determinative period.  He testified, however, that he did continue to work through the end of 2014, obtaining his position earning ten dollars per hour with Affordable Tree Service in November of that year.[9]  Therefore, according to Father's testimony, he earned some measure of income throughout the determinative period, including a wage of ten dollars per hour during the last few weeks of the period.

In finding that Father had the ability to utilize some of the funds he earned to make reasonable child support payments, the trial court emphasized L.H.'s testimony that when she was involved with Father in the spring of 2014, he was spending approximately $70.00 per day on Roxicodone pills.  Father testified that he and L.H. met in November 2012 and maintained a romantic relationship for three years, living together with L.H.'s daughter for a portion of that time.  L.H. testified that she had stayed "completely sober and clean" for three years until she began using illicit drugs with Father in March or April of 2014.  She stated that Father would typically use two Roxicodone pills per day with each costing him approximately $35.00.

Mother also testified that during the years Father and she were together, the drug of choice for both of them had been Roxicodone.  For his part, Father denied taking any drugs for which he did not have a prescription during the months in 2014 when he was not incarcerated.  He did admit to smoking marijuana during that time.  Concerning how he was able to afford marijuana, Father stated:  "I probably went and picked some up from some place and sold some bud and made some."

---

[8] Father initially testified that his last month of work for LQM was August 2013.  However, when the trial court subsequently requested a clarification concerning the dates of employment, Father stated that he was employed with LQM from June through August in 2014.

[9] Father at one point testified that he began working for Affordable Tree Service in November or December of 2014.  However, when subsequently questioned regarding when he resumed regular employment in late 2014, he indicated the month of November.

In support of his argument, Father relies in part on the decision in *In re Alysia S.*, 460 S.W.3d at 570-72, in which this Court reversed the trial court's finding that the mother had willfully failed to support her daughter upon analyzing detailed testimony regarding the mother's income and expenses. This Court determined that the mother's income barely covered her living expenses and that, during the statutory determinative period, she had spent some funds to pursue legal action to regain custody of her child and to accomplish the tasks set before her by DCS. *See id.* at 570 ("Simply finding that Mother worked and was compensated at some point during the four-month period does not, by itself, mean that she had the ability to pay child support."). We determine the case at bar to be highly factually distinguishable from *In re Alysia S.*

In this case, Maternal Grandparents elicited testimony delineating Father's employment history and most recent income when not incarcerated, as well as testimony regarding his expenditures on illicit drugs. At no time during trial did Father claim to have legitimate, extraordinary expenses that would have prevented him from sending reasonable payments in support of the Children during the determinative period or during any period when the Children were in Maternal Grandparents' custody while Father was not incarcerated. On the contrary, Father acknowledged during trial that he was capable of earning income when not incarcerated and that he had an obligation to support the Children. Father instead chose to spend his discretionary income on drugs.

Upon careful review, we conclude that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father had the ability to make reasonable payments toward support of the Children during the determinative period. Furthermore, Father failed to offer any justifiable excuse for his failure to provide at least some measure of financial support during the determinative period. *See In re Audrey S.*, 182 S.W.3d at 864 (explaining that failure to visit or support a child is "willful" when a person is "aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."); *see, e.g., State, Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006), *perm. app. denied* (Tenn. May 1, 2006) (affirming the trial court's termination of the mother's parental rights on the ground of abandonment through failure to support when the mother had the ability to pay an amount of $15.00 monthly, assessed to be reasonable in consideration of her income, and failed to do so during the determinative period).

Father also argues that the trial court erred in terminating his parental rights based on this statutory ground because he was not informed in advance that failure to pay child support could lead to termination of his parental rights. Father analogizes the situation to one in which DCS would be the petitioner to terminate parental rights to

children in DCS's custody and would have failed to inform the parents of the potential consequence for failing to pay support. Father asserts that because no court order directing him to pay support existed and because this was a privately handled matter, he did not have the opportunity to utilize an attorney's advice regarding the importance of paying support until the determinative period had passed. We determine Father's argument in this regard to be unavailing.

In support of his argument, Father again relies on *In re Alysia S.*, 460 S.W.3d at 571, in which this Court noted as one of several contributing factors to the mother's failure to pay support that despite having at one point entered into a permanency plan with DCS, she "had never been advised of the criteria and procedures for terminating her parental rights or the definition of abandonment." As this Court explained:

> By statute, parties to a permanency plan "for any child in foster care" must be provided with a copy of the criteria and procedures for terminating parental rights, including the definitions of "abandonment." Tenn. Code Ann. § 37-2-403(a)(2)(A). This provision is "designed to inform parents, before they engage in conduct constituting abandonment, of the potential consequences of that conduct." *In re K.C.,* No. M2005-00633-COA-R3-PT, 2005 WL 2453877, at *10 (Tenn. Ct. App. Oct. 4, 2005). Alysia was not placed in foster care, so DCS did not advise Mother of the criteria and procedures for terminating parental rights.

*Id.*, 460 S.W.3d 536, 542 n.2. In contrast, Father has presented no proof that he entered into a permanency plan when DCS was initially involved in the Children's removal from the parents' custody. The record provides no indication regarding whether the Children were ever in foster care when they were initially placed with Maternal Grandparents. Father consequently has presented no proof that the notice requirement of Tennessee Code Annotated § 37-2-403(a)(2)(A) (2014), applicable to permanency plans entered into "between the parents, the agency and the caseworker of such agency," would apply in this case.

As Father acknowledged during trial, the court system was open to him throughout the years that the Children were in Maternal Grandparents' custody. Father stated: "I guess I should have went to the court and had that [child support] took care of because I was the dad." Father acknowledged that when he sent the $100 money order to Maternal Grandparents, he did so at least in part for legal reasons, explaining that he was planning to petition in the future to regain custody of the Children. Father also testified that when he was employed at Krystal in 2013, he anticipated that child support enforcement would catch up to him and that he would have to begin paying child support in addition to the health insurance deduction he was required to pay. Nonetheless, Father admittedly did

16

not send any payments to Maternal Grandparents after sending the single $100 money order in 2012 or 2013.

Moreover, apart from Father's testimony demonstrating his understanding of his obligation to support the Children, it is well settled in Tennessee that every parent is presumed to have knowledge of a parent's duty to support his or her minor children regardless of whether a court order to that effect is in place. *See* Tenn. Code Ann. § 36-1-102(1)(H) (Supp. 2016) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"); *Kirkpatrick v. O'Neal*, 197 S.W.3d 674, 680 (Tenn. 2006) (holding "that a parent is liable for the support of his or her child throughout minority, with or without the existence of a court order, and that parents are liable for support retroactively from the date custody is granted to another person.").

As this Court has explained:

> The Supreme Court has held that, in the context of termination proceedings initiated by a private party as opposed to DCS, there need be no showing that the biological parent was aware of the consequences of her failure to visit or support her child, in order to show willfulness. *In Matter of M.L.P.,* 281 S.W.3d 387, 392 (Tenn. 2009). This is because persons are presumed to know the law, and a parent should know that she has such responsibilities for her child. *Id.*

*In re Keri C.*, 384 S.W.3d 731, 746 (Tenn. Ct. App. 2010), *perm. app. denied* (Tenn. Feb. 17, 2011). The trial court did not err in terminating Father's parental rights based upon this statutory ground.

### B. Willful Failure to Visit

Father also contends that the trial court erred by finding that he had willfully failed to visit the Children during the determinative period. In its memorandum opinion, the trial court specified the following pertinent findings of fact regarding the ground of abandonment by willful failure to visit the Children:

> Father has visited the following times since January 2014 to present:

> | | |
> |---|---|
> | January 2014 - February 2014 | 0 visits and 0 phone contact |
> | March 2014 | 1 visit for Briley's birthday |
> | April 2014 | 2 visits for 2 hours |

| | |
|---|---|
| May 2014 | 1 visit for 1½ hours |
| June 2014 - August 2016 | 0 visits and 0 phone contact |

Father admitted that he was incarcerated for approximately 10-20 days in 2014, leaving 345 other days which he could have visited or attempted to visit his children. The last visit Father had with his children was May 11, 2014 and he has been incarcerated since December 31, 2014.

* * *

Father admitted to having no visits with his children after May 11, 2014 when he visited at [Maternal Grandparents'] house and said he was leaving to get juice boxes for his son to take to school the next day and then inexplicably never returned. Father stated that there was nothing negative about the visit in May 2014, but that he simply forgot to come back to his children. Father's children did not forget that he was to return. Father's paramour stated that they were abusing drugs at this time and that they were under the influence during some of the visits with the minor children. She further stated that she left her minor child in Father's care when she knew he was under the influence of illicit substances. Father gave no plausible reason for not visiting his children.

Father admitted that [Maternal Grandparents] allowed him to visit the children at their home and also allowed him to visit at his mother's home. Father admitted that [Maternal Grandparents] never told him that he could not visit with his children. Father has not had the minor children unsupervised overnight since his minor daughter's birth [in March] 2011. Father admitted that his failure to visit was his fault and that his continued drug use and criminal behavior kept him away from his children. Father did attempt to contact [Maternal Grandparents] via Facebook a couple of times but that minimal effort was the extent of his pains to see his children after May 11, 2014. He did not drive to [Maternal Grandparents'] house, did not leave notes, and did not take any legal action to visit. During the five years that [Maternal Grandparents] have had custody of the children, Father did interact with his children during his sporadic visits and the children at one point did have a connection with Father. Unfortunately, Father did not make his children a priority and the once tenuous bond that he did have has been severed with the minor children. The Court finds by clear and convincing evidence that Father willfully failed to visit his children after May 11, 2014. Father's visitation during 2014 was token at

18

best. Father only had four visits with his children in 2014 and none in 2015.

The trial court therefore found by clear and convincing evidence that Father had willfully failed to visit the Children during the determinative four-month period immediately preceding his December 31, 2014 incarceration. We agree with this conclusion.

Father does not dispute that he failed to visit the Children or speak with them during the determinative period, admitting that his last visit with the Children occurred on May 11, 2014. He argues that the trial court erred in finding that his failure to visit was willful because Maternal Grandmother did not respond to Facebook messages he sent during the determinative period. Father acknowledged that he had left at the end of his last visit in May 2014 with the stated intent of returning with juice boxes for Braxton but had then failed to return. At one point in his testimony, Father described his failure to return on May 11, 2014, and subsequent failure to visit as a "disappearance," stating:

> After what happened in – after my disappearance, I guess I should say, in 2014 my mom went over there [to Maternal Grandparents' home] a couple of times with items I'd given my mother. . . . Unfortunately, I'd fallen back into drug use and made some bad choices.

It is well settled in Tennessee that "[a] parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempts to visit the child." *In the Matter of M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.") (internal citations and footnote omitted); *see, e.g., In re Taliah L.B.*, No. E2012-02102-COA-R3-PT, 2013 WL 1319573, at *9 (Tenn. Ct. App. Apr. 2, 2013) ("While Mother's ability to visit with the Child was 'restrained' in that Custodial Parents refused the request for continued *unsupervised* visitation, the limitation did not significantly interfere with Mother's ability to visit the Child during the requisite time period.") (emphasis in original).

In support of his argument, Father cites Maternal Grandmother's testimony in response to a question regarding why she had not responded to Father's Facebook messages during the determinative period:

> And the reason I didn't respond is because I thought it was time to quit having him [Father] coming in and out of their [the Children's] lives. He

19

was, had probation, he was in violation of probation. He had active warrants against him that we had heard about and I just, I just simply did not answer it. I just simply did not want him in the children's lives.

On appeal, Father also intimates that Maternal Grandparents interfered with his ability to visit the Children by changing their cellular telephone numbers without providing Father with the numbers. Father testified that in the past, he had spoken to the Children "numerous times" on the telephone, usually reaching them by calling Maternal Grandmother but also sometimes by calling the Children's maternal great-grandmother when the Children were with her. Father stated that he believed Maternal Grandparents had since changed their telephone numbers without informing him.

Although Father stated that he did not "think" he had Maternal Grandparents' telephone numbers during the determinative period, he did not describe any thwarted attempts to call old numbers or access new ones. Maternal Grandmother testified that she and William N. ("Maternal Grandfather") had changed their cellular telephone service company and that she was "not really sure" whether the numbers had changed. She acknowledged that they did not possess a landline telephone at home. For his part, Maternal Grandfather acknowledged that he had generally left contact with Father via telephone or Facebook to Maternal Grandmother. It is undisputed that Maternal Grandparents' residence had remained the same throughout the years the Children were in their custody.

In response to Father's argument, Maternal Grandparents rely in part on this Court's recent decision in *In re Gavin G.*, No. M2014-01657-COA-R3-PT, 2015 WL 3882841, at *7 (Tenn. Ct. App. June 23, 2015), for the proposition that Father could have pursued visitation through the court system if he believed that Maternal Grandparents were unreasonably denying him the opportunity to visit the Children. In *Gavin G.*, this Court determined that a proper contributing factor to the trial court's finding that the father had willfully failed to visit the child was the father's failure to file a motion to enforce his visitation rights if he believed the petitioners were unreasonably denying him an opportunity to visit. *Id.* (explaining that although the father "was under no requirement to seek court assistance to enforce his visitation rights," "taking legal action to enforce visitation rights can preclude a finding of willfulness") (citing *In re M.L.P.*, No. W2007-01278-COA-R3-PT, 2008 WL 933086, at *11 (Tenn. Ct. App. Apr. 8, 2008), *aff'd by In re M.L.P.*, 281 S.W.3d 387 (Tenn. 2009)).

As the trial court noted, "Father admitted that [Maternal Grandparents] never told him that he could not visit with his children." Furthermore, Father acknowledges that during the determinative period, he never attempted to drive to the Maternal Grandparents' residence to visit the Children or to initiate any legal action to establish his

visitation rights. We conclude that the evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Father willfully failed to visit the Children during the determinative period. The trial court did not err in terminating Father's parental rights to the Children based upon this statutory ground.

## V. Tennessee Code Annotated § 36-1-113(g)(9)(A)

Father further contends that in terminating his parental rights based on the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A), the trial court erred by finding him to be a putative father rather than a legal father of the Children. Upon finding Father to be a putative father, the trial court found that subsection -113(g)(9)(A) applied and proceeded to find clear and convincing evidence that Father had "failed to manifest an ability and willingness to assume legal and physical custody of his child[ren]" and that "placing custody of the child[ren] in [Father's] legal and physical custody would pose a risk of substantial harm to them." *See* Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv)-(v) (2014 & Supp. 2016).

We determine that the trial court properly found Father to be a putative father to the Children. However, upon thorough review, we further determine that the trial court erred by applying an amended version of Tennessee Code Annotated § 36-1-113(g)(9)(A) not yet in effect when this action was commenced. Although neither party has raised the issue of whether, given an affirmed status of Father as a putative father, the trial court properly applied the controlling version of Tennessee Code Annotated § 36-1-113(g)(9)(A), we must address the applicability of the governing version of the statute due to the fundamental constitutional interest involved. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).[10]

### A. Putative Father Status

In determining that, absent further evidence demonstrating that Father had executed a sworn acknowledgment of paternity concerning the Children, Father's status was that of a putative father, the trial court stated the following in its memorandum opinion:

---

[10] We note that in the argument section of his principal brief, Father alternatively asserts that the trial court erred by finding clear and convincing evidence of the two statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv)-(v). However, in his statement of the issues, Father solely asserts regarding these statutory grounds that the determination of his putative status was in error. *See* Tenn. R. App. P. 27(4). Inasmuch as we have concluded that the trial court erred by applying the amended statutory section to Father, we further conclude that any argument regarding the substance of the subsection -113(g)(9)(A) grounds is pretermitted as moot.

Father confirmed that he is listed as the father of both minor children on their birth certificates. [Maternal Grandparents] filed the Putative Father Registry report which states at the bottom that Father has not filed a notice of intent to claim paternity or acknowledgment of paternity but that he is on the birth certificates and has the right to receive notice of the child's pending adoption. If father has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 and 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, then these additional grounds are not available to [Maternal Grandparents]. But since the evidence admitted at trial makes it unclear whether Father has signed an unrevoked and sworn acknowledgment of paternity under the provisions of Tennessee law, the court will address these two grounds as if he is a putative father.

The version of Tennessee Code Annotated § 36-1-113(g)(9) (2014) in effect at the time this action was commenced provided in pertinent part:

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

* * *

    (iv)    The person has failed to manifest an ability and willingness to assume legal and physical custody of the child; [or]

    (v)    Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; . . . .

Tennessee Code Annotated § 36-1-117 (2014) concerns service of process to parties for termination proceedings, particularly, as relevant here, to a putative father. Subsection -117(b) sets forth the rights of the putative father if a paternity petition has been filed, and subsection -117(c) sets forth the rights of a putative father who has not filed a paternity petition. It is undisputed that Father did not file a paternity petition concerning either Braxton or Briley. As relevant to the definition of a putative father applicable to this action, the controlling version of subsection -117(c), cross-referenced in the applicable version of § 36-1-113(g)(9), provided:

22

(c)   The parental rights of the putative biological father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

   (1)   The biological father of a child has filed with the putative father registry, pursuant to § 36-2-318 a statement of an intent to claim paternity of the child at any time prior to or within thirty (30) days after the child's birth and has notified the registry of all address changes;

   (2)   The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable;

   (3)   The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the provisions of the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

   (4)   The biological father is recorded on the child's birth certificate as the father of the child; . . . .

Tenn. Code Ann § 36-1-117 (2014).[11]

On appeal, neither party has cited Tennessee Code Annotated § 36-1-117 in their respective arguments concerning Father's status. The trial court in its memorandum opinion applied the definition of "legal parent" provided in Tennessee Code Annotated § 36-1-102(28) to determine that Father was a putative father rather than a legal parent, and the parties have addressed that definition on appeal. Tennessee Code Annotated § 36-1-102(28)(A) (2014 & Supp. 2016) defines a legal parent as follows in pertinent part:

(i)     The biological mother of a child;

(ii)    A man who is or has been married to the biological mother of the child if the child was born during the marriage or within three hundred (300) days after the marriage was terminated for any reason, or if the child was born after a decree of separation was entered by a court;

(iii)   A man who attempted to marry the biological mother of the child before the child's birth by a marriage apparently in compliance with the law, even if the marriage is declared invalid, if the child was born during the attempted marriage or within three hundred (300) days after the termination of the attempted marriage for any reason;

(iv)    A man who has been adjudicated to be the legal father of the child by any court or administrative body of this state or any other state or territory or foreign country or who has signed, pursuant to §§ 24-7-113, 68-3-203(g), 68-3-302 or 68-3-305(b), an unrevoked and sworn acknowledgment of paternity under Tennessee law, or who has signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country; or

(v)     An adoptive parent of a child or adult[.]

*See In re Bernard T.*, 319 S.W.3d at 598-99 (delineating the ways in which an individual may obtain the status of a child's legal father) (citing Tenn. Code Ann. § 36-1-102(28)).

_____

[11] Effective March 23, 2016, subsequent to the commencement of this action, the General Assembly amended Tennessee Code Annotated § 36-1-117 to substitute the phrase, "putative father" wherever "putative biological father" previously had appeared. *See* 2016 Tenn. Pub. Acts, Ch. 636 § 3 (S.B. 2531).

Pursuant to this statutory definition, we determine that the trial court properly found that Father is not a legal father to the Children because he presented no evidence that he executed unrevoked and sworn acknowledgments of paternity. *See* Tenn. Code Ann. § 36-1-102(28)(A)(iv).[12] The Children's birth certificates were not presented at trial and are not in the record before us. As the trial court noted, Maternal Grandparents did present a report for each child from Tennessee's Putative Father Registry. In the "Comments" section of each report, it is noted that "[n]o person has filed a notice of intent to claim paternity or acknowledgment of paternity" of the subject child and that "since a father is identified on the birth certificate, he has the right to receive notice of the child's pending adoption." The reports indicate that Father is identified as the father on both Braxton's and Briley's birth certificates.

Father testified that when Braxton was born, he had signed the birth certificate as Braxton's father and that his parents had also signed because Father was underage. Father acknowledged that he was incarcerated when Briley was born. On appeal, he argues that he "is assumed to have signed" Briley's birth certificate because, according to the report from the Putative Father Registry, his name appears as the father on Briley's birth certificate.

Tennessee Code Annotated § 68-3-302 (2014), cross-referenced in Tennessee Code Annotated § 36-1-102(28)(A)(iv), provides in pertinent part:

(c)    Immediately before or after the birth of a child to an unmarried woman in a birthing institution, an authorized representative of the birthing institution shall provide to the mother, and, if present, the biological father:

(1)    Written and oral information concerning the alternatives to, the legal consequences of, the rights, and the responsibilities arising from the completion of the voluntary acknowledgment. The information shall be provided to the birthing institution by the department of human services, which shall develop the information in conjunction with the department of health. A videotaped or audio presentation will satisfy the requirement for the oral explanation.

(2)    An acknowledgment of paternity on a form approved pursuant to § 68-3-305(b), and shall provide the opportunity

---

[12] Although the trial court in its memorandum opinion and Maternal Grandparents in their responsive brief refer to this subsection as "36-1-102(28)(D)," we note that in both the version controlling in this action and the current version, the subsection is codified at § 36-1-102(28)(A)(iv) (2014 & Supp. 2016).

to complete and submit to the institution the acknowledgment form.

(d) The birthing institution or other entity receiving the voluntary acknowledgment of paternity shall forward the original, signed acknowledgment of paternity to the office of vital records, and shall send a copy of the signed and notarized acknowledgment of paternity to the Title IV-D child support agency where the mother resides, if the mother or child is receiving temporary assistance pursuant to title 71, chapter 3, part 1, medicaid, TennCare, or any successor programs. Copies of the signed and notarized voluntary acknowledgment of paternity shall also be provided to the mother and father of the child. The copies shall be deemed originals.

*See generally* Tenn. Code Ann. § 68-3-305(b)(2)(A) (2014) (providing, in the case of a child born to an unmarried mother, for entry of the father's surname and information on the child's birth certificate upon receipt by the office of vital records of "an original, sworn acknowledgment signed by both the mother and the biological father of a child, on a form provided by the state registrar or the department of human services . . . .").

Contrary to Father's argument, the fact that his name appears on the Children's birth certificates does not, *ipso facto*, satisfy the requirement of unrevoked and sworn acknowledgments of paternity. *See* Tenn. Code Ann. § 36-1-102(28)(A)(iv); *see also In re Amadi A.,* No. W2014-01281-COA-R3-JV, 2015 WL 1956247, at \*4 (Tenn. Ct. App. Apr. 24, 2015) ("Although a birth certificate provides ''"prima facie evidence of the facts stated,"'' pursuant to Tenn. Code Ann. § 68-3-202, the names listed on the birth certificate 'are not a finding of parentage nor do they create or terminate parental rights.'") (quoting *In re Adoption of A.F.C.*, No. M2013-00583-COA-R3-CV, 2014 WL 3540670 (Tenn. Ct. App. July 16, 2014), *perm. app. denied* (Tenn. Nov. 20, 2014)). Inasmuch as Father presented no documentation of signed and notarized voluntary acknowledgments of paternity or even of the Children's actual birth certificates, we must agree with the trial court that "the evidence admitted at trial makes it unclear whether Father has signed . . . unrevoked and sworn acknowledgment[s] of paternity under the provisions of Tennessee law."[13]

---

[13] We note that in the portion of the trial court's final judgment addressing the child support ground, the court stated that Father, "having been adjudicated the legal father of the minor children has willfully failed to support his children." Inasmuch as the trial court subsequently made specific findings of fact as to Father's status as a putative father, the record contains no indication that Father had ever been adjudicated a legal father, and no party has raised this phrase in the judgment as an issue on appeal, we determine the use of the phrase, "having been adjudicated the legal father" to be a harmless clerical error in the trial court's judgment. *See, e.g, In re Caleb L.C.*, 362 S.W.3d 581, 598 (Tenn. Ct. App. 2011)

However, pursuant to Tennessee Code Annotated § 36-1-117(c)(4), the recordation of Father on the Children's birth certificates, as noted by the Putative Father Registry reports, does provide him with the status of a putative father whose parental rights "shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest before the court may enter an order of adoption concerning [the Children]." We note that Father had also claimed in the past to DCS and Maternal Grandparents that he was the father of the Children, further giving credence to the trial court's determination of his status as a putative father. *See* Tenn. Code Ann. § 36-1-117(c)(3).

### B. Application of Statutory Grounds to Putative Father

The trial court in its memorandum opinion relied on the amended version of Tennessee Code Annotated § 36-1-113(g)(9)(A) that became effective on March 23, 2016. *See* 2016 Tenn. Pub. Acts, Ch. 636 § 5 (S.B. 2531). However, Maternal Grandparents filed the termination petition on April 15, 2015, prior to the effective date of the amendment. We determine that the version of the statute in effect at the time of the petition's filing controls this action. As this Court recently has explained:

> The introductory paragraph of Tenn. Code Ann. § 36-1-113(g)(9)(A) was modified with an effective date of March 23, 2016. "Statutes are presumed to operate prospectively unless the legislature clearly indicates otherwise." *Nutt v. Champion Int'l Corp.,* 980 S.W.2d 365, 368 (Tenn. 1998). The Tennessee Supreme Court has already considered whether an earlier modification of Tenn. Code Ann. § 36-1-113(g)(9)(A) should be applied prospectively or retroactively, and it determined that it should be applied prospectively. *In re D.A.H.,* 142 S.W.3d 267, 272-74 (Tenn. 2004). Thus, the version of the statute that was in force when the petition was filed governs this case.

*In re Tianna B.,* No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *7 (Tenn. Ct. App. July 6, 2016).

The introductory paragraph of Tennessee Code Annotated § 36-1-113(g)(9)(A) serves to explain to whom the statutory grounds in that subsection may be applied to terminate parental rights. The version governing this action provided as an introduction:

---

(finding that typographical errors noted by the appellant in the trial court's detailed judgment did not affect the overall clarity of the judgment or this Court's analysis).

27

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds . . . .

The amended version of this subsection substitutes the phrase, "is the putative father of the child," in place of the phrases, "is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c)." *See* 2016 Tenn. Pub. Acts Ch. 636 § 5 (S.B. 2531).

Under the prior version of the statute, our Supreme Court has held that "[t]he grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *In re Bernard T.*, 319 S.W.3d at 599; *see In re Ashton B.*, No. W2015-01864-COA-R3-PT, 2016 WL 981320, at *11 (Tenn. Ct. App. Mar. 15, 2016), *perm. app. denied* (Tenn. July 6, 2016) ("Thus, the *Bernard* Court clearly and unequivocally held that the grounds contained in Section 36-1-113(g)(9)(A), which includes the ground of failure to establish paternity, may not apply to putative biological fathers.").

Although this Court previously has detected a conflict between the express language of the relevant *Bernard* holding and the prior version of the statute, this Court has declined, in accordance with *Bernard*, to apply the statutory grounds provided in the prior version of Tennessee Code Annotated § 36-1-113(g)(9)(A) to putative fathers. *See In re Ashton B.*, 2016 WL 981320, at *13 ("Regardless of our concerns regarding the *Bernard* Court's interpretation of Tennessee Code Annotated Section 36-1-113(g)(9)(A), however, we are not free to depart from the Tennessee Supreme Court's unequivocal holding."); *see, e.g., In re Candice H.*, No. M2016-02305-COA-R3-PT, 2017 WL 2365008, at *11 (Tenn. Ct. App. May 31, 2017); *In re Mac L.*, No. E2016-00674-COA-R3-PT, 2016 WL 6876498, at *8 (Tenn. Ct. App. Nov. 22, 2016); *In re Tianna B.*, No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *8 (Tenn. Ct. App. July 6, 2016); *In re Cloey R.*, No. E2014-00924-COA-R3-PT, 2015 WL 273685, at *9 (Tenn. Ct. App. Jan. 21, 2015).

We recognize that despite the pertinent *Bernard* holding, other panels of this Court have affirmed the application of the prior version of Tennessee Code Annotated § 36-1-113(g)(9)(A) to putative biological fathers. *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *7 n.5 (Tenn. Ct. App. Apr. 11, 2016) (acknowledging disagreement with *In re Ashton B.*, 2016 WL 981320, but determining the "plain

language" of Tenn. Code Ann. § 36-1-117(b) and (c) to indicate that the statutory grounds provided in Tenn. Code Ann. § 36-1-113(g)(9)(A) would be applicable to a putative father); *In re Alexis M.M.*, No. E2012-00022-COA-R3-PT, 2012 WL 3553628, at *7 (Tenn. Ct. App. Aug. 20, 2012) (affirming application of § -113(g)(9)(A) grounds to a putative biological father without mentioning *Bernard*); *In re Dixie M.M.*, No. M2012-01226-COA-R3-PT, 2012 WL 4474155, at *7-8 (Tenn. Ct. App. Sept. 27, 2012) (affirming application of a § -113(g)(9) ground to a putative biological father while citing *Bernard* for other purposes).

This Court recently applied the amended version of Tennessee Code Annotated § 36-1-113(g)(9)(A) to an action in which the termination petition against the putative father was filed subsequent to the amendment's effective date of March 23, 2016. *See In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, at *6 (Tenn. Ct. App. June 6, 2017). This Court stated in relevant part:

> On March 23, 2016, the legislature amended the wording of the statute [Tenn. Code Ann. § 36-1-113(g)(9)(A)] to explicitly state that these additional grounds applied to "the putative father of the child." *See* 2016 Pub. Acts, c. 636, § 5, eff. Mar. 23, 2016.
>
> Here, the trial court found that the petition to terminate parental rights was filed after the legislature amended the statute. Because neither party disputes the trial court's finding that the current version of section 36-1-113(g)(9) applies in this case, we will assume that the March 2016 amendment is applicable here.

*Id.* at *6.

In the case at bar, however, Maternal Grandparents' termination petition was filed prior to the effective date of the statutory amendment. The *Bernard* holding determining the statutory grounds provided in the prior version of Tennessee Code Annotated § 36-1-113(g)(9)(A) to be inapplicable to putative fathers has not been revisited or overturned by the Tennessee Supreme Court. We must therefore follow binding precedent and reverse the trial court's application of subsection -113(g)(9)(A) grounds to Father in this action. *See In re Candice H.*, 2017 WL 2365008, at *11 (reversing the trial court's application of a subsection -113(g)(9)(A) ground to the putative father under the prior version of the statute upon determining that "[w]e are obliged . . . to adhere to binding case precedent of the Tennessee Supreme Court.").

## VI. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) (Supp. 2016) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

At the conclusion of trial, the trial court considered a recommendation from the guardian *ad litem* that it would be in the Children's best interest to terminate Father's parental rights. The court subsequently analyzed the best interest factors, specifying in its memorandum opinion the following findings of fact in relevant part:

After making determinations of credibility of witnesses, the Court finds the following facts by clear and convincing evidence. . . . [Mother] was 16 years old and [Father] was 17 years old when their son [Braxton] was born. Due to their youth, the parents received financial and emotional support from the maternal and paternal grandparents. Unfortunately, the young parents were unable to rise to the challenge of being new parents and [in March] 2011, Briley [] was born drug exposed. The parents lived together during the mother's gestation with Briley. At some point during Mother's pregnancy, Father was incarcerated and was therefore unable to be present at his daughter's birth. Maternal grandparents were present at Briley's birth. On March 21, 2011, Washington County Juvenile Court placed the temporary care and custody of the minor children with the maternal grandparents through a placement by [DCS]. The minor children have resided with the maternal grandparents since that date and have never been returned to their biological parents' custody. When Briley was

31

approximately two years old, she met her Father. Mother and Father have struggled with drug addiction since their children were born. Paternal Grandmother stated that she could not make Father attend a drug rehabilitation program because he was an adult; but that she would have made him go if she could. The parents have remained clean for short periods of time but have failed to exhibit any long term sobriety. The Court sincerely hopes that both parents will achieve/maintain the goal of sobriety.

Both parents have criminal histories but since Mother has surrendered her parental rights, the Court will focus on Father's behavior. Since the birth of his son, Father has been convicted of aggravated burglary, theft over $1,000, violation of probation, eight more counts of theft, trespassing, evading arrest and/or filing false report, simple assault, attempt to introduce contraband; and he currently is charged with introduction of contraband. Father is currently incarcerated. The Court credits Mother's testimony that Father was involved in criminal and drug activity while parenting his son. The Court credits Father's paramour that Father was involved in criminal and drug activity while parenting his son and daughter.

* * *

The Court incorporates all previous findings of fact in the best interests' analysis. In addition, due to Father's continued incarcerations and drug use, Father has failed to make an adjustment of circumstance that would make it safe and in the children's best interest to be in his home. Father has not maintained regular visitation or other contact with his children and therefore a meaningful relationship has not been maintained with them. The physical environment of Father's previous homes was not healthy and safe, there was continuous criminal activity in the home, and there were controlled substances or controlled substance analogues that rendered Father consistently unable to care for children in a safe and stable manner. Father lived with his paramour who also used controlled substances while caring for her minor child. Father candidly admits that he has not complied with his parental responsibility of financially supporting his children.

The children have bonded to [Maternal Grandparents] and they would be negatively affected by a change of caretakers and physical environment. All parties agree that [Maternal Grandparents] are very loving, supportive and kind people who are committed to raising the minor

children in a loving, safe, nurturing environment and that the children have flourished under their care and guidance. The Court in no way wishes to hamper the Father in his quest for rehabilitation, but finds by clear and convincing evidence that the children's best interest would be served by the termination of Father's rights.

The trial court therefore concluded by clear and convincing evidence that it was in the Children's best interest to terminate Father's parental rights. Upon careful review, we agree with this conclusion.

Father argues that the trial court erred in its analysis of the statutory best interest factors by (1) finding that it was in the best interest of the Children to continue seeing Mother but not Father inasmuch as Mother was residing at the time of trial with Maternal Grandparents, (2) finding that Father's physical environment was not safe for the Children based solely on Father's history of criminal behavior and drug addiction, (3) failing to give sufficient weight to the prior bond of the Children with Father, and (4) considering eight-year-old Braxton's desire to be adopted. We will address each of Father's arguments in turn.

First, we note that on appeal, Father appears to couch the issue of whether the Children will continue to see Mother once they are adopted by Maternal Grandparents as a claim of unfairness to Father. He cites no specific factor in the best interest analysis as affected by the potential for Mother's continued presence in the Children's lives. As Maternal Grandparents point out, such a "fairness" argument as to Father is irrelevant within the best interest analysis because, upon the determination of clear and convincing evidence of a statutory ground for termination of Father's parental rights, Father's interest and those of the Children diverge, with the focus shifting to the best interest of the Children. *See In re Audrey S.*, 182 S.W.3d at 877.

Maternal Grandmother and Maternal Grandfather each respectively testified that Mother had been residing with them for approximately two weeks prior to trial. Maternal Grandfather testified that Mother was on parole and had been drug free for twenty-one months according to drug screens administered by her parole officer. He stated that he felt obligated to help Mother because she was his daughter but that if he ever suspected she was using drugs again, he would not allow her around the Children. Maternal Grandmother emphasized that Mother was not staying with them permanently and that Mother was not left unsupervised with the Children at any time. Mother testified that she was in the process of relocating to reside with a paramour. As the trial court noted, Mother surrendered her parental rights to the Children during the pendency of this action. Father cites no evidence, and none is indicated in the record, that Mother's supervised presence in Maternal Grandparents' home posed a risk of harm to the Children.

Second, Father acknowledges that he was incarcerated at the time of trial but argues that in considering his living conditions and ability to care for the Children, the trial court failed to consider his potential for residing with a family member upon his release. The trial court specifically found regarding the physical environment of Father's living conditions prior to incarceration: "The physical environment of Father's previous homes was not healthy and safe, there was continuous criminal activity in the home, and there were controlled substances or controlled substance analogues that rendered Father consistently unable to care for children in a safe and stable manner." *See* Tenn. Code Ann. § 36-1-113(i)(7). The court further found that Father had failed to make an adjustment in his circumstances, conduct, or conditions that would make it safe and in the Children's best interest to be in his home. *See* Tenn. Code Ann. § 36-1-113(i)(1).

As Father notes, the trial court made no findings regarding physical hazards or a lack of cleanliness in Father's prior residences, and testimony demonstrated that Father had consistently behaved appropriately toward the Children when he was with them. However, the court's finding that Father had engaged in drug use and criminal activity while residing with Mother and Braxton and later during the time period that Father was visiting the Children was well supported by Father's criminal history and by testimony from Mother, L.H., and Father himself. Paternal Grandmother opined that following his release from incarceration, Father would be able to care for the Children with the emotional support of Paternal Grandparents and by "staying away from the wrong crowd, reporting to probation, working." Father presented no evidence, however, regarding the specific details of where he would reside. The evidence does not preponderate against the trial court's finding as to this factor.

Third, Father argues that the trial court failed to properly consider his meaningful bond with the Children prior to the cessation of visitation after May 2014. *See* Tenn. Code Ann. § 36-1-113(i)(4). We disagree. It is important to note that the trial court incorporated into its best interest analysis the finding that Father had abandoned the Children by failing to visit them during the determinative period. *See* Tenn. Code Ann. § 36-1-113(i)(3). At the time of trial, eight-year-old Braxton had not resided with Father since Braxton was three years of age. Five-year-old Briley had never resided with Father, who was incarcerated at the time she was born. Although testimony undisputedly demonstrated that Father had been attentive to the Children when in their presence, Father had not been in the Children's presence since his admitted "disappearance" from their lives following the May 11, 2014 visit. During his testimony, Father expressed regret that he had "lost too many years of [his] son and daughter over stupid things." While noting with approval Father's expressed desire to rehabilitate and change his life, the trial court nonetheless found that Father had lost any meaningful bond he may have had with the Children through his long absence from their daily lives. The evidence does

34

not preponderate against the trial court's findings as to the statutory factors of visitation and lack of a meaningful bond. *See* Tenn. Code Ann. § 36-1-113(i)(3)-(4).[14]

Fourth, Father argues that the trial court erred by allowing eight-year-old Braxton to "dictate" to the trial court his desire to be adopted. Braxton did not testify at trial. Father's argument is based on Maternal Grandmother's testimony in response to questions concerning why she desired to file a petition for adoption and what she believed would be in the best interest of the Children. Maternal Grandmother stated in response to a question regarding the Children's best interest:

> I absolutely think this would devastate these children to be removed from our home. We are, we have been their life for five years and my grandson has personally told me that this, he wants to be adopted and this is where he wants to be, and he, that he loves it at home. He's happy where he's at and he does not want to go with his mother or his father, and he has personally told me that.

Father also cites Maternal Grandmother's subsequent testimony that she believed Braxton should have a voice in whether he might have some type of relationship with Father in the future.

Contrary to Father's argument, we discern no indication in the record that the trial court inappropriately relied on Maternal Grandmother's testimony regarding Braxton's wishes. The trial court found that the Children "have bonded to [Maternal Grandparents] and they would be negatively affected by a change of caretakers and physical environment." *See* Tenn. Code Ann. § 36-1-113(i)(5). During trial, Father acknowledged the bond between the Children and Maternal Grandparents and thanked Maternal Grandparents for taking good care of the Children. Father's argument in this regard is unavailing.

In addition, the trial court incorporated into its best interest analysis its finding that Father had abandoned the Children by failing to provide more than token financial support throughout the years the Children had been in Maternal Grandparents' custody. *See* Tenn. Code Ann. § 36-1-113(i)(9). Upon a careful and thorough review of the record, we conclude that clear and convincing evidence supports the trial court's finding that termination of Father's parental rights was in the Children's best interest.

---

[14] We are not persuaded by Father's additional argument that the trial court failed to properly consider the Children's prior bond with Father's family. The statutory factor at issue involves "[w]hether a meaningful relationship has otherwise been established between <u>the parent or guardian</u> and the child[.]." *See* Tenn. Code Ann. § 36-1-113(i)(4) (emphasis added).

## VII.  Conclusion

The decision of the trial court is affirmed in part and reversed in part.  We reverse the trial court's application to Father of the statutory grounds provided in Tennessee Code Annotated § 36-1-113(g)(9)(A)(iv)-(v).  We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Children.  Costs on appeal are assessed equally to the appellant, Kevin M., and the appellees, Donna N. and William N.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE