IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 2, 2017

## IN RE TAYA K.

**Appeal from the Chancery Court for Dickson County**
**No. 2016-CV-79     David D. Wolfe, Judge**

_____

### No. M2017-00846-COA-R3-PT

_____

Mother and Stepfather filed a petition to terminate Father's parental rights and to allow Stepfather to adopt the minor child. Following a hearing, the trial court terminated Father's parental rights, finding that Father abandoned his child by willful failure to visit and support, and that Father failed to establish paternity of the child. The trial court also found that termination of Father's parental rights was in the child's best interest. Father timely appealed. After review, we have determined that the record contains clear and convincing evidence to support two of the three grounds for termination, and to support the trial court's conclusion that terminating Father's parental rights is in the child's best interest. Thus, we affirm the termination of Father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S. delivered the opinion of the Court, in which THOMAS R. FRIERSON II and BRANDON O. GIBSON, JJ., joined.

Jennifer L. Honeycutt, Nashville, Tennessee, for the appellant, Robert K. Jr.[1]

Crystal M. Morgan, Ashland City, Tennessee, for the appellees, James and Jacqueline M.

Bradley K. Sanders, Dickson, Tennessee, for the minor child, Taya K.

### OPINION

Taya K. was born to Jacqueline M. ("Mother") and Robert K. Jr. ("Father") in November of 2009. Although the parents were never married, they were living together at the time Taya was born and later separated when the child was approximately six months

--------------------------------

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

old. Mother and Father initially maintained an amicable relationship after the separation, allowing Father to have parenting time with Taya. However, the relationship between the parents began to deteriorate around February 2013 when Mother began dating James M. ("Stepfather"). As time passed and Mother moved on with her life, Father continued to struggle with drug and alcohol issues. Father found himself to be a frequent resident of various county jails in the years that followed the couple's break up, and his contact with Taya dwindled.

Mother married Stepfather on May 7, 2015. Shortly thereafter, the couple moved with Taya from East Tennessee to Dickson County, which is a six-hour drive from Father, who resides in Hancock County.

On March 16, 2016, Mother and Stepfather filed a Petition For Adoption By Step Parent and Termination of Parental Rights in the Chancery Court of Dickson County, Tennessee. The petition alleged that termination of Father's rights was warranted because Father abandoned Taya, failed to pay child support, engaged in only token visitation with the child, did not have the ability or willingness to assume legal and physical custody of the child, and alleged that placing the child in Father's custody would result in substantial harm to the child. A hearing was held on March 8, 2017, wherein the trial court heard extensive testimony from Mother, Stepfather, and Father. The court also heard brief testimony from an officer with the Dickson County jail.

Mother testified that Father seldom visited with Taya, and when asked to describe Taya's relationship with Father, Mother said:

> Taya -- I mean, she'll tell you she loves her dad. She knows who he is. As far as a relationship, that's kind of hard to describe because there isn't really an established relationship, if that makes sense. She just hasn't seen him consistently enough.

Mother testified the reason she ended the relationship with Father was related to his drug use. She stated that Father has given Taya a few birthday gifts and "one or two" Christmas presents over the years. Mother has, however, made an effort to allow Taya to remain in contact with her paternal grandparents. Mother regularly communicates with the grandparents to arrange visits with Taya a few times a year when Mother goes to visit other family in East Tennessee. Sometimes Father is at these visits, but sometimes it is just the grandparents.

Mother did admit that on one occasion she denied Father's request to see Taya. Father was in Nashville with his girlfriend for a doctor's appointment, and he asked if he could see Taya. Mother testified that she was not comfortable with a visit because she did not know who Father had with him, and she was aware of Father's ongoing criminal problems, including a recent gun accident that happened at Father's house involving his

- 2 -

girlfriend. Mother was concerned for the safety of her child and so she denied Father's request to visit with Taya. Mother also stated that this was the only time she ever denied Father's request to visit with their daughter.

Mother testified that Father seldom paid any child support. She said there was a four-month period in 2010 when Father was drawing unemployment, and he sent her some money. She also said that he paid for two or three weeks of childcare for Taya several years ago, but that was the extent of any support paid.

Both Stepfather and Mother testified that Stepfather has been very involved and a consistent part of Taya's life since she was three years old. He helps her with homework, assists in taking and picking her up from school, and attends her extracurricular activities. Mother also testified that Taya referred to both Stepfather and Father as "Dad."

Father testified he last saw Taya in January 2017, during one of Mother's trips to East Tennessee. On this afternoon, Father and the paternal grandparents took Taya shopping and out to eat. Prior to that visit, Father did not recall the last time he saw his daughter. He believed he saw Taya around her birthday, in November 2015, and guessed that his last overnight visit with her was sometime in 2013 or 2014. Father testified that he tried to call his daughter "a couple of times," but said "[s]ince [Taya] moved to Nashville, I haven't spoken to her no more than probably ten words." Father also admitted to sometimes calling late at night, long after Taya went to bed. Father stated he texted Mother on occasion and received no response. He said Mother has blocked him on Facebook and argued that he has not had an address for Taya since Mother moved to Nashville.

When questioned at trial, Father did not know what school his daughter attended. He could not say who her doctor was or how many teeth she had lost. He was asked what extra-curricular activities Taya participated in, and Father was not certain. However, Father maintained that he had a loving relationship with his daughter. Father did admit that Mother and Stepfather have taken good care of Taya, stating, "[She]'s been well taken care of. I can't say that she ain't been. I'm proud of [Mother] for doing that."

Father also admitted that he has never paid child support. He did testify that he has "sent money on occasions," and said that "when [he is] working," he sends money to Mother. Father also stated that "[Mother] kn[ew] if she needed something from my mom or dad, she didn't need to ask me for it or -- she could get it from them." The trial court found this comment significant and later addressed it in its oral ruling, reminding Father that "it is not his parents' obligation to support this child."

At the time of trial, Father was in jail in Hancock County for a violation of probation offense. To facilitate Father's participation at trial, he was transported by correctional officers from Hancock County to Dickson County jail. Father testified that

he has two felonies on his record: a felony DUI and a conviction for unlawful possession of a firearm. Additionally, Father testified that he had numerous misdemeanor charges, including drug possession, DUIs, violation of parole offenses, and had been charged with driving on a suspended license in at least four states.[2] Father confirmed he has not held a valid driver's license in about three years.

During cross-examination, counsel for Mother asked Father if he only visited his daughter when Mother brought her to visit his parents in Hancock County. Father generally agreed but insisted that Mother had denied Father's request for visitation on one occasion. Father testified that he contacted Mother while he was in Nashville for his girlfriend's doctor's appointment. Mother refused to let him see Taya and told him he would need to contact an attorney if he wanted to see his daughter. When the trial court asked Father why he did not contact an attorney, he explained he could not because he was incarcerated shortly thereafter. Regarding the evidence of Father's sporadic employment, Father testified that when employed, he worked as a welder, but stated that he did not have a job lined up for when he was released from jail.

An officer from the Dickson County jail was also called to testify. The officer stated that on the morning of trial, he discovered Father attempting to smuggle in a vial of urine to falsify a drug screen. According to the officer, "[Father] said he might have a drug test today, and he was going to use it for a drug test." Father pled the fifth when asked whether he tried to falsify his drug screen but later admitted that he could not pass a drug test on the day of trial.

In a Final Order entered April 18, 2017, the trial court terminated Father's parental rights, finding that Father abandoned his child by willful failure to visit and support and that Father failed to establish paternity of the child. The trial court also found that termination of Father's parental rights was in the child's best interest. Father timely appealed.

Father raised the following issues on appeal:

1. Whether the trial court erred in terminating Father's parental rights based upon the ground of abandonment for failure to visit.

---

[2] When questioned about his criminal history, Father said he did not know how many times he has been in jail.

> Q. Okay. How many times have you been incarcerated?
> A. I don't know. I couldn't tell you. I don't know.
> Q. You don't know how many times you've been incarcerated?
> A. No. I don't count it.

2. Whether the trial court erred in terminating Father's parental rights based upon the ground of abandonment for failure to pay child support.
3. Whether the trial court erred in terminating Father's parental rights based upon the ground of failure to establish paternity.
4. Whether the trial court erred in finding that the termination of Father's parental rights was in the best interest of the minor child.

## ANALYSIS

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

## I. ABANDONMENT FOR FAILURE TO VISIT

Father argues that the trial court erred in terminating his parental rights based upon the ground of abandonment because his failure to visit was not willful.

Parental rights may be terminated for abandonment under Tenn. Code Ann. § 36–1–102(1)(A)(i) and § 36–1–113(g)(1) where a parent "willfully" fails to visit the child for the four months preceding the filing of the petition to terminate that parent's rights. Failure to visit a child is "willful" when (1) a parent is aware of his or her duty to visit, (2) the parent has the capacity to visit, (3) the parent makes no attempt to visit, and (4) the parent has no justifiable excuse for not visiting. *In re Audrey S.,* 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005). Whether a parent failed to visit a child is a question of fact. *In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801, at *3 (Tenn. Ct. App. Oct. 4, 2013). "Whether a parent's failure to visit constitutes willful abandonment, however, is a question of law." *Id.* We review questions of law de novo with no presumption of correctness. *Id.*

The trial court concluded Father had the ability to coordinate visits with Taya but chose not to. In its Final Order, the trial court stated:

> The Court further found by clear and convincing evidence that the Respondent willfully failed to visit with the child for a four-month period of time prior to the filing of this Petition. There was evidence that he visited the child one time in January after the filing of this Petition, and then prior to that it had been approximately two years since he had exercised visitation or seen this child. His excuse was that on one occasion when he contacted the Mother when he was in Nashville, she told him to get a lawyer, but he didn't do that. He … chose not to … get a lawyer.

Father last saw his child in January 2017 in what we consider to be a token visit. Under Tenn. Code Ann. § 36-1-102(C), "token visitation" is visitation "under the circumstances of the individual case, [which] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." This January 2017 visit was one of the times when Mother contacted the paternal grandparents to let them know that she and Taya would be in East Tennessee. Taya spent a few hours with the paternal grandparents and Father, shopping and going out to eat. A visit of this nature is a classic example of a token visit, given that prior to that visit, Father testified that he could not recall the last time he had seen his daughter. Additional testimony confirmed Father last saw his daughter approximately two years earlier, around her birthday in November 2015, and that the child's last overnight visit with Father was in 2013 or 2014.

For purposes of Tenn. Code Ann. § 36–1–102(1)(A)(i), we look at the four-month period immediately preceding the March 2016 filing of the petition. The evidence is undisputed that Father did not visit Taya during this time period. Tennessee law also requires a parent to take affirmative action or steps to restore his relationship with his child or to seek visitation, which Father did not do. *In re Jacobe M.J.*, 434 S.W.3d 565, 570 (Tenn. Ct. App. 2013). Father argued that he was never given an address for Taya when she moved to the Nashville area. However, Father knew how to contact Mother, and in fact, did contact Mother when he was in Nashville with his girlfriend for a doctor's appointment. The fact that Father did not have an address for Mother in Nashville is not a valid excuse. In this one instance, Father demonstrated he was aware of his duty to visit his child, he had the capacity to visit, and he made an attempt to visit. *In re Audrey S.*, 182 S.W.3d at 864. Thus, Father had "no justifiable excuse for not visiting" Taya at all other times. *Id.*

Father's argument that he did not have a valid driver's license or reliable transportation to prove that his failure to visit was not willful is also unfounded. As Father acknowledged, he was able to travel to Nashville with his girlfriend when she had

a doctor's appointment. The paternal grandparents also had regular visits with Taya, and the testimony was clear that Father knew those visits were taking place because sometimes Father was present for those visits in East Tennessee, and sometimes he was not. It is also undisputed that the only times Father ever saw his child was when Mother traveled with Taya to East Tennessee and voluntarily coordinated visits with the paternal grandparents. The trial court placed great significance on the fact that Mother continued to allow the paternal grandparents to have visitation on a regular basis with the child, giving Father the opportunity to visit with Taya, yet he seldom did.

We agree the evidence is clear and convincing that Father's failure to visit was willful. As such, we affirm the termination of Father's rights on the ground of abandonment for failure to visit.

## II.   ABANDONMENT FOR FAILURE TO PAY CHILD SUPPORT

We next address whether Father's parental rights may be terminated based on abandonment for failure to pay child support.

"Willful failure to support or to make reasonable payments toward support means 'the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); Tenn. Code Ann. § 36–1–102(1)(D). Token support payments are not sufficient to prevent a finding of a willful failure to support. *In re Adoption of Angela E.*, 402 S.W.3d at 641. Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36–1–102(1)(B).

The evidence is undisputed that Father failed to provide any meaningful monetary support for his daughter. By Father's own admission, he has never paid child support. He did testify that he "sent money on occasions," and said that when he was working, he sent money to Mother. There was a four-month period in 2010 when Father was drawing unemployment, and he sent some of that money to Mother. Father also paid for two or three weeks of childcare for Taya when the child was younger, but that is the extent of any support paid.

Father also testified that "[Mother] kn[ew] if she needed something from my mom or dad, she didn't need to ask me for it or -- she could get it from them." The trial court admonished Father for this assertion, stating that

> The Court is of the opinion that it is not his parents' obligation to support
> this child. It is not incumbent upon the Mother to seek out the Father to ask
> him to contribute to the support. It is the Father's legal obligation to support

the child, and it is his obligation to take affirmative steps to do so. He failed to do so.

The trial court also succinctly summarized its position regarding Father's willful failure to support his child.

> The evidence showed that [Father] was sporadically employed, he had opportunity to be out of jail and to be employed and to pay support but he chose not to do so.

Our review of the record supports the trial court's conclusion that there is clear and convincing evidence that Father willfully failed to support his child. Therefore, we affirm the termination of Father's parental rights based on the ground of abandonment for failure to pay child support.

### III.    FAILURE TO ESTABLISH PATERNITY

Father argues that the trial court erred in terminating his parental rights on the ground of failure to establish paternity. We have determined that the trial court erroneously applied the amended version of Tenn. Code Ann. § 36-1-113(g)(9)(A) that became effective on March 23, 2016. We have also determined that the version of the statute that was in effect when the petition was filed cannot be applied as a ground for termination because Father was the "putative biological father." *See In re Bernard T.*, 319 S.W.3d 586, 599 (Tenn. 2010).

Mother and Stepfather filed their termination petition on March 16, 2016, prior to the effective date of the amendment to Tenn. Code Ann. § 36-1-113(g)(9)(A), which the trial court relied on to hold that this ground had been proven. *See* 2016 Tenn. Pub. Acts, Ch. 636 § 5 (S.B. 2531). In two recent decisions, this court held that the version of the statute in effect when the petition for termination of parental rights was filed governs the case, and that it would constitute error to retrospectively apply an amendment to a statute that was not in effect when the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017), *appeal denied* (Sept. 29, 2017); *see also In re Tianna B.*, No. E2015-02189-COA-R3-PT, 2016 WL 3729386, at *7 (Tenn. Ct. App. July 6, 2016). Moreover, our Supreme Court has already considered whether an earlier modification of Tenn. Code Ann. § 36-1-113(g)(9)(A) should be applied prospectively or retroactively, and it determined that the statute should be applied prospectively. *See In re D.A.H.*, 142 S.W.3d 267, 272-74 (Tenn. 2004). Therefore, the version of the statute that was in force when the petition was filed governs this case. *In re Braxton M.*, 531 S.W.3d at 732; *In re Tianna B.*, 2016 WL 3729386, at *7. Based on these authorities, the trial court erred by relying on the amendment to Tenn. Code Ann. § 36-1-113(g)(9)(A) to hold that this ground had been proven.

Therefore, we must consider whether Mother and Stepfather proved the ground based on the version of the statute that was in force when the petition was filed. The introductory paragraph of Tenn. Code Ann. § 36-1-113(g)(9)(A), which is the portion of the statute at issue here, was modified with an effective date of March 23, 2016. *See* 2016 Tenn. Pub. Acts, Ch. 636 § 5 (S.B. 2531). Our Supreme Court previously held "[t]he grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) [which were in effect when the petition at issue here was filed] cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or *putative biological father* at the time the termination petition is filed." *In re Bernard T.*, 319 S.W.3d at 599 (citing *In re D.A.H.*, 142 S.W.3d 267, 272–73 (Tenn. 2004)) (emphasis added).

Father claims to be Taya's legal parent because his name is listed as the father on the birth certificate; however, his reliance on this one fact is misplaced. Contrary to Father's claim, the mere fact his name appears on the birth certificate is not sufficient to confer the status of a legal parent. Pursuant to Tenn. Code Ann. § 36-1-117(c)(4), the recording of Father on the birth certificate merely provides him with "the status of a putative father." *In re Braxton M.*, 531 S.W.3d at 732. As we have previously explained, "[a] birth certificate provides 'prima facie evidence of the facts stated' therein. *See* Tenn. Code Ann. § 68-3-202. However, the names listed thereon are not a finding of parentage nor do they create or terminate parental rights." *In re Adoption of A.F.C.*, 491 S.W.3d 316, 319 (Tenn. Ct. App. 2014). As here, where the child was born to an unmarried couple,

> the biological father's execution of a voluntary acknowledgment of paternity pursuant to Tenn. Code Ann. § 24-7-113 constitutes a "legal finding of paternity." Once the sworn acknowledgment is signed by the mother and the biological father of the child and the form is submitted to the office of vital records, the biological father's name may be "entered in the spaces provided on the birth certificate." Tenn. Code Ann. § 68-3-305(b)(2)(A). Thus, it is the voluntary acknowledgment of paternity that is legally operable, not the child's birth certificate.

*In re Adoption of A.F.C.*, 491 S.W.3d at 319 n.2.

Here, there is no evidence that Father signed a sworn acknowledgment of paternity; thus, the birth certificate merely affords Father "the status of a putative father." *In re Braxton M.*, 531 S.W.3d at 732. As noted earlier, our Supreme Court has held that the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9), those in effect when Mother and Stepfather's petition was filed, cannot be used to terminate the rights of a person who is a child's *putative biological father*. *See In re Bernard T.*, 319 S.W.3d at 599 (emphasis added). Therefore, Tenn. Code Ann. § 36-1-113(g)(9) fails to establish a ground for termination of Father's parental rights.

Accordingly, we reverse the trial court's ruling that Mother and Stepfather proved the ground based on Father's failure to establish paternity.

## IV. BEST INTEREST

To terminate parental rights, a court must determine not only that the evidence provides clear and convincing proof that grounds for termination exist, but also that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)–(2). If one of the statutory grounds for termination is proven by clear and convincing evidence, a parent's rights may be terminated if termination is in the best interests of the child. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

The legislature has identified nine statutory factors for the court to consider in conducting a best-interests analysis, *see* Tenn. Code Ann. § 36-1-113(i); however, this list is not exhaustive, and the court need not find the existence of every factor before it may conclude that terminating an individual's parental rights is in the best interests of a child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Further, in considering a petition to terminate parental rights, the court is called to make a determination of the child's best interest from the perspective of the child rather than the parent. *In re Heaven L.F.*, 311 S.W.3d at 441.

Here, the trial court went through an extensive best interest analysis. Each of the relevant factors addressed by the trial court weighs in favor of terminating Father's parental rights. The Final Order states, in pertinent part[3],

- Factor 1 — whether a parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian. This Court finds that [Father] had continued to engage in illegal activity as recently as December of 2016 when he was violated his probation for a failed drug screen and testified today that he would not be able to pass a drug screen and would test positive for two different controlled substances and marijuana.

. . .

---

[3] Factors 2 and 6 are omitted because the trial court acknowledged they were not relevant.

- Factor 3 — whether a parent or guardian has maintained a regular visitation or other contact with the child. The Court finds there was a willful failure to visit under the statute.
- Factor 4 — whether a meaningful relationship has otherwise been established between the parent or guardian and child. The Court finds that, while the child knows who her Father is, that is due to the Mother keeping the child informed of that fact and has allowed the grandparents to continue to have visitation. This is not what the Court would determine to be a meaningful relationship. A meaningful relationship with this child would be that [Father] has been able to fulfill the role of Father and, in this case, he has failed to do so.
- Factor 5 — the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition. The Court finds that the continuity of placement and the problems that were testified to of the child's behavior after returning from a visit with the Father certainly mitigated in favor of termination.

. . .

- Factor 7 — whether the physical environment of the parent or guardian's home is healthy and safe, whether there is any criminal activity in the home. The Court finds that [Father] is currently in jail so there was no evidence before the Court of his home other than the fact that he in incarcerated. Clearly, there is criminal activity in the home.
- Factor 8 — whether the parent or guardian's mental or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child. The Court finds that [Father] has an obvious drug and alcohol addiction for which he has sought treatment but clearly had relapsed again as recently as December, having tested positive for these matters and causing him to be incarcerated again.
- Factor 9 — whether the parent or guardian has paid child support consistent with the child support guidelines. The Court has already found that the Father has not done so.

The trial court found that terminating Father's parental rights was in the child's best interest. The record fully supports this finding. Accordingly, we affirm the trial court's determination that the termination of Father's parental rights is in the child's best interest.

## IN CONCLUSION

We affirm the findings by the trial court that Father willfully failed to visit and support his child during the four-month period preceding the filing of this petition; therefore the ground of abandonment for failure to visit and failure to support under Tenn. Code Ann. § 36-1-113(g)(1) has been established. We respectfully reverse the trial court's finding that the ground for termination based on Father's failure to establish paternity under Tenn. Code Ann. § 36-1-113(g)(9)(A) was proven. As for the trial court's determination that termination of Father's rights is in the best interest of the child, we affirm. Therefore, we affirm the termination of Father's parental rights and this matter is remanded with costs of appeal assessed against the appellant, Robert K. Jr.

_____
FRANK G. CLEMENT JR., P.J., M.S.