FILED
04/07/2026
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 8, 2026 Session

### IN RE BRADY R.

**Appeal from the Chancery Court for Putnam County**
**No. 2023-6-A   Ronald Thurman, Judge**

_____

**No. M2025-00691-COA-R3-PT**

_____

This appeal arises from a petition to terminate the parental rights of a father for the purposes of adoption.  The petitioners, the child's stepfather and mother, alleged that the father abandoned the child both by failing to visit and by failing to support.  When father failed to participate in discovery, the petitioners moved for a default as a sanction.  After granting the requested default and holding an evidentiary hearing, the trial court concluded that there was clear and convincing evidence of abandonment and that termination of father's parental rights was in the child's best interest.  Finding no reversible error, we affirm the termination of parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY BENNETT and JEFFREY USMAN, JJ., joined.

M. Tyler Daniels, Cookeville, Tennessee, for the appellant, Coby R.

Michael Weston, Cookeville, Tennessee, for the appellees, Samantha P. and Tristan P.

### OPINION

#### I.

#### A.

By the time Tristan P. ("Stepfather") petitioned to terminate the parental rights of Coby R. ("Father") to Brady R. and for adoption in 2023, Father had not visited with the child in over twenty months.  He had not provided support for the child for even longer.

The petition also alleged that Father was incarcerated and that his anticipated release date was unknown.

Stepfather had cared for the child along with the child's mother, Samantha P. ("Mother"), for several years. They had married fifteen months before filing the petition, which Mother joined in support of Stepfather's request to adopt. *See* Tenn. Code Ann. § 36-1-115(c) (Supp. 2025) (requiring the petitioner's spouse to join a petition for adoption).

Father filed a handwritten response to the petition, and the court appointed him counsel. The case sat dormant for some time, and then, at a status conference, the court granted Father's counsel permission to withdraw and appointed substitute counsel. Later, Stepfather and Mother served Father's substitute counsel with interrogatories and requests for production of documents. When Father failed to respond to the discovery after several months, Stepfather and Mother moved to compel responses. The court entered an agreed order that required Father to respond to the discovery within twenty days of the entry of the order. The agreed order included a finding that Father had not "responded to his counsel of record after his counsel of record attempted to communicate with him."

Despite the order compelling responses to discovery, Father still failed to respond, leading Stepfather and Mother to move for sanctions. Their motion requested, among other sanctions, that Father's response to the termination petition be stricken and that a default be entered.

By the time the motion for sanctions was heard, the discovery sent to Father had been outstanding for nearly ten months. Father did not appear for the hearing, but his counsel did. When the court asked counsel for his position on the request for sanctions, counsel responded that he "d[idn't] really have a leg to stand on." Counsel also recounted his unsuccessful efforts to communicate with his client. Ultimately, the court struck Father's response and granted the requested default.

At the hearing on the petition to terminate, only Stepfather and Mother testified. As for Father's contact with the child, Mother explained that she informally agreed with Father that he would have the child on Wednesday and Saturday nights. But, according to Mother, Father did not regularly exercise his visitation. Although the agreed upon pick-up time was 7:00, "[s]ometimes he wouldn't come until 9," and "[s]ometimes he wouldn't come at all." When Father exercised his visitation, he typically did so with his mother, with whom he lived at the time.

Mother married Stepfather in 2020, just over nine years after the child's birth. Following her marriage, she attempted to abide by her agreed visitation schedule with Father, but that effort ended in May 2021. One Saturday that month, a day she intended to drop the child off with Father, she received a text message from Father's mother alerting

2

Mother that Father had been arrested for a traffic violation. When Stepfather and Mother called the clerk's office the following Monday to find out the circumstances behind the arrest, Mother learned that Father "had been pulled over and they found needles, scales and straws in his vehicle." At that point, Stepfather and Mother decided not to permit Father further visitation until he could provide a "clean" drug test.

The following month, for Father's Day, Mother and Stepfather decided to permit Father to speak with the child by phone. Mother testified that Father "sounded very under the influence," so the child was not allowed to speak to Father. Stepfather recalled the circumstances differently. His recollection was that, at some point, Father called to speak with the child, but Stepfather and Mother refused because Father "sounded inebriated." Later, they allowed the child to call, and the child wished Father a happy Father's Day. Mother and Stepfather agreed that Father's Day 2021 was the last contact Father had with the child.

Father's record of financial support for the child was no better. Despite being court ordered to pay support of just under $500 per month, Mother testified Father last paid child support in March 2021.

The proof showed that Father's was incarcerated again in June 2022. He ultimately pleaded guilty to aggravated assault with a deadly weapon, a Class C felony, and was sentenced to three years, with one year to be served in jail and the remainder to be served on supervised probation. *Id.* § 39-13-102(a)(1)(A)(iii), (e)(1)(A)(ii) (Supp. 2021). When the hearing on the termination petition took place, although Father was no longer incarcerated, he was facing an allegation that he had violated the terms of his probation.[1]

Based on the evidence offered by Stepfather and Mother, the court terminated Father's parental rights and granted Stepfather's petition to adopt the child. The court concluded that there was clear and convincing evidence of abandonment by an incarcerated parent both by failure to visit and failure to support. *Id.* §§ 36-1-113(c)(1), (g)(1), -102(1)(A)(iv) (2021). In its judgment, which incorporated by reference the court's oral ruling, the court found that Father did not visit or provide support "in the relevant four (4) month period of non-incarceration immediately preceding the filing of the verified petition to terminate parental rights," referencing a specific exhibit introduced into evidence at the hearing. The court also concluded that there was clear and convincing evidence that termination of Father's parental rights was in child's best interest. *Id.* § 36-1-113(c)(2).

---

[1] The evidence showed that Father had a positive urine drug screen for fentanyl in March 2024. When Father reported for another drug screen almost a month later, he attempted to falsify the results. Father later pleaded guilty to falsification of the results of a drug test. *See* Tenn. Code Ann. § 39-17-437(a)(1) (2025).

B.

Eleven days after the entry of the judgment granting sanctions and terminating his parental rights, Father moved to set the judgment aside. As grounds, he alleged that his lack of participation in the case "was due to inadvertence and/or excusable neglect." He noted that his original counsel had left private practice two months after being appointed to represent Father and that nothing had happened in the case for over one year. Because his original counsel had left private practice for the public sector, Father complained that, from May 2023 until he was appointed substitute counsel in March 2024, he "did not have counsel actively working his case or advising him." He acknowledged that his substitute counsel had "participated in several hearings, including the final hearing," but Father complained that he first learned of substitute counsel's appointment and identity after the final hearing. In addition to setting aside the prior judgment, Father asked for time to amend his handwritten response to the petition and to answer discovery.

At the hearing on the motion to set aside, only Father testified; much of that testimony focused on his original appointed counsel. He admitted that, despite being in jail at the time of the filing, he was made aware of the petition to terminate his parental rights. The month after the petition was filed, Father was released from jail, and he filed a written response to the petition and an affidavit of indigency shortly thereafter. Father spoke with his original appointed counsel by phone several times, but later he called his counsel's office and was informed that his counsel no longer worked there. Father was able to speak with his counsel again via a cell phone number he was provided, but when Father tried to call "back, like, six months [later], whatever, the phone was no longer in service."

When he could not reach his original appointed counsel by phone, Father testified that he visited the court clerk's office twice to inquire about the status of the case to terminate his parental rights. On the first occasion, he claimed that he was told "[d]on't worry about it," "[y]ou already filed an affidavit for the attorney," and "[t]hey'll appoint you another one." On the second, after waiting for an hour to speak with someone, he was told the same thing.

Father said he was unaware that, over a year after the filing of the termination petition, the court held a status conference at which his original counsel was granted permission to withdraw and that he was appointed substitute counsel. Father only met his substitute counsel eighteen days after the hearing on the termination when Father again found himself in jail following a recent arrest.

The court denied the motion to set aside the default and the judgment terminating Father's parental rights. It noted that the default was a sanction for failure to respond to discovery and that Father had still not answered the interrogatories. As for Father's request to set aside the judgment terminating his parental rights, the court found that, when Father

4

was out of contact with his original appointed counsel, the "case did not progress much" other than attempts to ascertain the status of the case, and the court took no action against Father during this period.[2]  Father also had not established any prejudice as a result of his original counsel's withdrawal.  The court found that substitute appointed counsel had "acted with due diligence in his search" for his client, "including calling all numbers he knew to call, sending letters, and utilizing Facebook."  Importantly, Father "knew how to avail himself of the court system."  He had visited the clerk's office during the pendency of the case, not only to file a response to the petition and an affidavit of indigency, but to check on the status of the case.  The court did not credit Father's testimony that he was told "not to worry about the case."

The court also considered whether Father had identified a valid defense to the petition to terminate.  It found that Father's testimony, rather than contradicting the proof presented by Stepfather and Mother, only strengthened the case for termination.  Father testified that he had worked for long periods of time when not incarcerated, which would have enabled him to support the child.  Father also confirmed that Mother offered to allow visitation if Father provided a clean drug test, but he never pursued that opportunity or requested court ordered visitation.  Beyond grounds, Father's testimony further buttressed the court's previous best interest determination.  Among other troubling events, he had recently "overdosed in jail on fentanyl (though, according to him, that was not his fault)."

## II.

On appeal, Father raises four issues for review.  First, he argues the trial court erred in not setting aside the default entered against him for failure to respond to discovery.  The remaining three issues relate to the grounds for termination and the best interest of the child.  Father contends that neither ground was supported by clear and convincing evidence.  Finally, Father contends that there was not clear and convincing evidence that termination was in the child's best interest.

## A.

Father submits that the trial court abused its discretion when it failed to set aside the default that was entered against him.  In the trial court and on appeal, Father relies on Tennessee Rule of Civil Procedure 60.02 as the basis for relief.  A court "may set aside a judgment by default in accordance with Rule 60.02" upon a showing of good cause.  TENN. R. CIV. P. 55.02.  But "[t]he function of . . . Rule [60.02] is to give relief from final judgments."  *Campbell v. Archer*, 555 S.W.2d 110, 112 (Tenn. 1977).  A default entered

---

[2] In a termination of parental rights case, the trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). The court acknowledged that the "case ha[d] gone well beyond the expedited process typically required in proceedings to terminate parental rights."

in a parental termination case is not a final judgment because proof of statutory grounds and the child's best interest is still required. *See* Tenn. Code Ann. § 36-1-117(n) (Supp. 2025); *see also In re Connor B.*, 603 S.W.3d 773, 783 (Tenn. Ct. App. 2020) (contrasting a default judgment in a parental termination case from a default judgment in other civil cases). Ordinarily, when relief is sought from a default that does not resolve all claims, rights, and liabilities of the parties, Tennessee Rule of Civil Procedure 54.02 applies. *See Discover Bank v. Morgan*, 363 S.W.3d 479, 490 (Tenn. 2012). The complicating factor here is that the default was entered as part of the final judgment terminating Father's rights. When relief is sought from a final judgment during the thirty-day period following its entry, Tennessee Rule of Civil Procedure 59 applies. *Id.* at 488-89; *see also Youree v. Recovery House of E. Tenn., LLC*, 705 S.W.3d 193, 204 (Tenn. 2025). So we consider Father's request for relief from the default as a request under Rule 59.04 to alter or amend. *See Tenn. Farmers Mut. Ins. Co. v. Farmer*, 970 S.W.2d 453, 455 (Tenn. 1998) (holding that "courts must consider the substance of the [post-trial] motion, rather than its form").

A trial court's ruling on a motion to alter or amend, like rulings on a Rule 54.02 motion to revise or a Rule 60.02 motion for relief from a final judgment, is reviewed for an abuse of discretion. *Discover Bank*, 363 S.W.3d at 487. A court abuses its discretion when it applies the wrong legal standard, reaches "an illogical or unreasonable decision," or bases "its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). Our review of a discretionary decision is limited to determining whether the trial court's decision had the necessary factual support, whether the court identified and applied the correct law, and whether the court's decision was "within the range of acceptable alternative dispositions." *Id.*

A Rule 59.04 motion "provide[s] the trial court with an opportunity to correct errors before the judgment becomes final." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005). A motion to alter or amend may be granted "(1) when the controlling law changes before a judgment becomes final, (2) when previously unavailable evidence becomes available, or (3) when, for [unique] reasons, a judgment should be amended to correct a clear error of law or to prevent injustice." *Bradley v. McLeod*, 984 S.W.2d 929, 933 (Tenn. Ct. App. 1998), *overruled on other grounds*, *Harris v. Chern*, 33 S.W.3d 741, 742 (Tenn. 2000). Those reasons can include "mistake, inadvertence, surprise or excusable neglect." *Campbell*, 555 S.W.2d at 112.

Specifically with respect to default judgments, whether relief is sought under Rule 59 or Rule 60, additional criteria come into play. *See Discover Bank*, 363 S.W.3d at 491 (noting the same test used for relief under Rule 59 was adopted "for evaluating Rule 60.02(1) motions for relief from default judgments on 'excusable neglect' grounds"). Trial courts must consider "(1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted." *Tenn. Dep't of Hum. Servs. v. Barbee*, 689 S.W.2d 863, 866 (Tenn. 1985) (quoting *Davis v. Musler*, 713 F.2d 907, 915 (2nd Cir. 1983)). "[W]hether

6

the conduct precipitating the default was willful" is a threshold inquiry. *Discover Bank*, 363 S.W.3d at 493-94. "If the court finds that the defaulting party has acted willfully, the judgment cannot be set aside on 'excusable neglect' grounds, and the court need not consider the other factors." *Id.* at 494.

Here, Father's failure to respond to discovery led to the default. On appeal, Father contends that the trial court failed to find that his conduct was willful. While it is true that the court's order denying the motion to set aside does not use the word "willful," the order impliedly makes such a finding when it addresses Father's continuing failure to provide discovery responses despite being ordered to do so. In his testimony at the hearing on the motion to set aside, Father did not even address that failure, instead focusing on the deficiencies in representation by his prior counsel. As our supreme court has recognized, "[w]illfulness . . . includes 'conduct that is flagrant and unexplained.'" *Id.* at 493 (quoting *Hayes v. Hayes*, No. M2006-02356-COA-R3-CV, 2007 WL 2580026, at *2 (Tenn. Ct. App. Sept. 6, 2007)).

Father also claims that "[t]here is nothing in the record to suggest [he] had any knowledge that his original attorney had withdrawn or that he had been appointed new counsel." He attributes his failure to respond to discovery to that lack of knowledge. Father's testimony, however, contradicted this claim. He testified that he spoke with a court clerk on two occasions sometime after he filed his response and affidavit of indigency, and on both occasions, he was told by the clerk's office, referring to his attorney, "They'll appoint you another one."

Despite its findings concerning willfulness, the court went on to address the other two factors: meritorious defenses and prejudice. *See id.* at 494 n.27 (encouraging trial courts "to make alternative findings as to the other two factors where expedient to do so"). The court found Father's testimony "only strengthens the Petitioners' case" and that there appeared to be no meritorious defense. It also found Stepfather and Mother would be prejudiced by setting aside the default. In particular, the court focused on the unsettled situation for the family that would result if the default were set aside.

We discern no abuse of discretion in the denial of Father's motion to set aside the default. The decision had the necessary factual support, the correct law was identified and applied, and the decision fell within the range of acceptable alternative dispositions. *See Lee Med., Inc.*, 312 S.W.3d at 524.

B.

As noted above, although a default judgment was entered against Father, Stepfather and Mother were still required to prove both statutory grounds for termination and that termination was in the child's best interest. *See* Tenn. Code Ann. § 36-1-117(n). Because of the constitutional dimension of the rights at stake in a termination proceeding, parties

seeking to terminate parental rights must prove both the grounds for termination and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596. For his remaining issues on appeal, Father contends that neither the grounds nor the child's best interest were proven by clear and convincing evidence.

On appeal, the trial court's findings of fact are reviewed "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's conclusions of law are reviewed de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

1. Statutory Grounds for Termination

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). There are "alternative definitions for abandonment." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (defining the term "abandonment").[3] One definition, found at Tennessee Code Annotated § 36-1-102(1)(A)(iv), applies when a parent, like Father, was incarcerated when the termination petition was filed. An incarcerated parent can be deemed to have abandoned a child in several ways. For instance, a parent abandons his child by either failing to visit or failing to support the child "for four (4) consecutive months immediately preceding the parent's . . . incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a).

Both Stepfather and Mother testified, and the trial court found, that Father last visited the child in May 2021. The last communication between Father and the child was on Father's Day, June 20, 2021. Mother testified that Father began his incarceration the following year, in June 2022, and Father remained incarcerated through the date of the filing of the petition. So measured from either Father's last visit or his last call with the

---

[3] We use the statutory definition of "abandonment," as well as the version of the parental termination statute, effective as of the date of the filing of the petition to terminate. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

child, the proof showed that Father failed to visit far more than four consecutive months preceding his incarceration.

Father argues that, although he failed to visit for the requisite four-month period, his "lack of visitation was not willful" because he was "actively thwarted [from visiting] by Petitioner[s] without justification." Stepfather and Mother, according to Father, "stopped visitation based on–without proof—suspected drug use." A clean drug screen was made a condition of any future visitation only based on an "arrest[] for [drug] paraphernalia during a traffic stop." Father also faults Stepfather and Mother for not producing proof that Father was convicted of any offense associated with the stop. To him, the other criminal judgments introduced into evidence are irrelevant because they "show criminal conduct [occurring] well after May 2021."

Lack of willfulness is an affirmative defense to a claim of abandonment by either failure to visit or failure to support. *Id.* § 36-1-102(1)(I). However, Father did not raise an affirmative defense. Even had he done so, the evidence does not support a finding of a lack of willfulness on Father's part. A failure to visit is due to a lack of willfulness "if another person's conduct prevents the parent from visiting or 'amounts to a significant restraint of or interference with the parent's efforts to . . . develop a relationship with the child.'" *In re Mattie L.*, 618 S.W.3d 335, 350-51 (Tenn. 2021) (quoting *In re Audrey S.*, 182 S.W.3d at 864). Stepfather and Mother did not prevent Father from visiting the child; they only conditioned further agreed visitation on proof of sobriety. It was not a significant restraint or interference on Father's efforts to develop a relationship with the child. He had the option of pursuing court ordered visitation if he found the condition unreasonable under the circumstances.

The court also concluded that there was clear and convincing evidence of abandonment by an incarcerated parent by failure to support. Tenn. Code Ann. § 36-1-102(1)(A)(iv)(a). Although Mother testified Father last paid child support in March 2021, the trial court made no finding regarding when Father paid support. Similar to the court's finding regarding failure to visit, the court found that Father "did not provide support of the Minor in the relevant four (4) month period of non-incarceration immediately preceding the filing of the verified petition to terminate parental rights."

Father contends that the trial court's order is deficient on the ground of failure to support. Specifically, he contends that the determinative period of non-payment was not established or found by the court. We might agree with Father but for the fact that the court incorporated its oral ruling by reference in its final judgment. In its oral ruling, the court specifies that the determinative period is the same as for Father's failure to visit. By reference to an exhibit in its order, the court identified Father's date of incarceration as June 17, 2022. The exhibit referenced by the court also reveals that Father remained incarcerated through the date of the filing of the petition to terminate. Because the last

9

payment by Father was over a year prior to that date, as the court observed, the exact timeframe is "not really that important . . . because it's clearly met."[4]

We conclude that the facts provide clear and convincing evidence supporting all the elements of abandonment by an incarcerated parent by both failure to visit and failure to support.

2. Child's Best Interest

Having found two grounds for termination, the court next considered whether termination of Father's parental rights was in the best interest of the child. *Id.* § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 876-77. Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists twenty factors for courts to consider in determining whether termination of parental rights is in the child's best interests. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

The first three best-interest factors emphasize the child's need for stability and continuity. Factors (A) and (B) analyze "[t]he effect a termination of parental rights will have on the child's critical need for stability and continuity of placement" and "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition." Tenn. Code Ann. § 36-1-113(i)(1)(A)-(B). Factor (C) looks to whether the parent has demonstrated continuity and stability in meeting the child's basic needs. *Id.* § 36-1-113(i)(1)(C). The trial court found that Mother and Stepfather provided the child with affection, stability, and necessities while Father had not provided anything. It further found that, because the child was thriving with Mother and Stepfather, placing the child back with Father would be a detriment to the child's emotional, psychological, and medical health.

The next four factors focus on the child's relationship with the parent. Factors (D) and (E) question whether the parent and the child have or can reasonably create a healthy

_____

[4] Although we agree that the evidence clearly and convincing shows that Father abandoned the child by failure to visit and failure to support during the four-month period prior to his incarceration, the better practice is to specifically find the dates of non-incarceration. Such a practice best satisfies the statutory mandate that trial courts "enter an order that makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k).

attachment and whether the parent has regularly contacted the child with the aim of creating a positive relationship. *Id.* § 36-1-113(i)(1)(D)-(E). Factors (F) and (G) look to whether the child is fearful of living in the parent's home and whether the parent or parent's home triggers or exacerbates the child's "trauma or post-traumatic symptoms." *Id.* § 36-1-113(i)(1)(F)-(G). The trial court found that the child had no bond with Father but had a father-son relationship with Stepfather. Further, the court found that Father had not visited the child since May 2021 but was "thriving" with Stepfather and Mother.

Factors (H) and (I) consider the child's significant relationships in the absence of the parent. *Id.* § 36-1-113(i)(1)(H)-(I). The trial court found that the child had created significant relationships with Stepfather and Stepfather's family.

The next factors look at whether the parent has made a lasting adjustment to his circumstances such that the child could be safe in his care and whether he has demonstrated a sense of urgency in doing so. *Id.* § 36-1-113(i)(1)(J), (M). They also consider what resources were available to assist the parent in making a lasting change. *Id.* § 36-1-113(i)(1)(K)-(L). The court found Father continues to have issues with substance abuse. It further found that Father had made no attempt to try to obtain visitation or establish paternity.

Factors (O), (P), (Q), and (R) focus on the parent's ability to create a safe and healthy environment for the child. *Id.* § 36-1-113(i)(1)(O)-(R). Factors (O) and (P) address whether the parent has ever provided safe, stable care or demonstrated an understanding of the basic needs of the child. *Id.* § 36-1-113(i)(1)(O)-(P). Factors (Q) and (R) focus on the parent's ability to create a home that meets the child's needs where the child can thrive. *Id.* § 36-1-113(i)(1)(Q)-(R). The court found that the only care the child ever had outside of Mother and Stepfather was from Father's mother who had since passed away. No evidence was presented to show Father had a stable residence.

Lastly, Factor (S) addresses whether the parent has consistently provided financially for the child. *Id.* § 36-1-113(i)(1)(S). The court found that Father had not paid his child support obligation in several years.

The evidence does not preponderate against these findings. The combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interest.

## C.

Mother and Stepfather request attorney's fees for a frivolous appeal. *Id.* § 27-1-122 (2017). A frivolous appeal is one that is "utterly devoid of merit," *Combustion Engineering, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978), or has "no reasonable

chance of success," *Davis v. Gulf Insurance Group*, 546 S.W.2d 583, 586 (Tenn. 1977). Because this appeal was unsuccessful, not frivolous, we decline to award attorney's fees.

**III.**

The trial court did not abuse its discretion in denying the motion to set aside the default judgment, and we conclude the facts as found by the court clearly and convincingly support all the elements of the termination claim. Thus, we affirm the termination of Father's parental rights.

_s/ W. Neal McBrayer_
W. NEAL McBRAYER, JUDGE
